17 Cal.Rptr.3d 842 (2004)
96 P.3d 141
34 Cal.4th 210
In re the MARRIAGE OF Karen and Charles Erik HARRIS.
Karen Butler, Appellant,
v.
Charles Erik Harris et al., Respondents.
No. S101836.
Supreme Court of California.
August 23, 2004.
Rehearing Denied October 20, 2004.[*]
*844 Family Law Appellate Associates, Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer, Huntington Beach, for Appellant.
Karen A. Wyle; Julie E. Mumma, Sacramento; Guralnick & Gilliland, and Anne L. Rauch, San Diego, for the Coalition for Restoration of Parental Rights as Amicus Curiae on behalf of Appellant.
Martha Matthews, Mark D. Rosenbaum, Los Angeles; Charles A. Bird, San Diego, Jordan C. Budd; Joan H. Hollinger; Shannon Minter; and Shannan Wilber for ACLU Foundation of Southern California, ACLU Foundation of San Diego and Imperial Counties, Child Advocacy Program Law School  Boalt Hall, National Center for Lesbian Rights and Youth Law Center as Amici Curiae on behalf of Appellant.
Law Office of Paul W. Leehey and Paul W. Leehey, Fallbrook, for Respondents.
William Wesley Patton for Whittier Law School Legal Policy Clinic as Amicus Curiae on behalf of Respondents.
David Borges; Law Offices of Gollub & Golsan, Lorraine Gollub; Cooper-Gordon, Freida Gordon; Dawn Gray, Grass Valley; *845 Stephen Temko; Woodruff, O'Hair & Posner and D. Thomas Woodruff for the Association of Certified Family Law Specialists as Amicus Curiae on behalf of Respondents.
Myron Dean Quon, Patricia M. Logue and Jon W. Davidson for Lambda Legal Defense and Education Fund, Inc., as Amicus Curiae on behalf of Respondents.
Lawrence E. Fluharty for the Los Angeles Chapter of the National Association of Counsel for Children as Amicus Curiae.
*843 MORENO, J.
The superior court granted extensive visitation rights to the paternal grandparents of a five-year-old girl with the approval of the father but over the objection of the mother, who has sole custody of the child. Applying the United States Supreme Court's decision in Troxel v. Granville (2000) 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49, the Court of Appeal reversed, holding that the visitation order violated the mother's constitutional liberty interest in the custody, care, and control of her child.
For the reasons that follow, we conclude that Family Code section 3104 controls in this case and that the statute is constitutional, both on its face and as applied. Because the mother had sole custody of the child and objected to grandparent visitation, Family Code section 3104, subdivision (f), imposed a rebuttable presumption affecting the burden of proof that grandparent visitation was not in the child's best interest. The superior court did not utilize this presumption. Accordingly, we remand the case to permit the superior court to reconsider its order permitting grandparent visitation in light of the statutory presumption that grandparent visitation is not in the best interest of the child.

I. Facts
Appellant Karen Butler (the mother) married respondent Charles Harris (the father) on January 12, 1994. They separated on October 16, 1994, 10 days before the birth of their daughter, Emily. The mother filed for dissolution of marriage three months later, on January 18, 1995.
Clinical Psychologist Daniel O'Roarty, Ph.D., was appointed by the superior court to conduct a psychological assessment of the parties and reported that the mother and father met in San Diego in October, 1993, when the mother was a helicopter pilot in the Navy. They began living together two weeks after they met, later moving to a boat in the Chula Vista Marina. As noted above, they married in January, 1994, three months after they met.
The mother claimed that during the marriage the father was psychologically and physically abusive to her. He hit her and called her names. On one occasion, he pushed her overboard and then tried to run her over with their dinghy as she swam to shore. During an altercation when she was six months pregnant, he kicked her in the stomach.
The father denied these accusations, but admitted using and selling marijuana and, on one occasion, using crystal methamphetamine, and admitted striking and biting the mother on several occasions that he described as mutually combative.
As noted above, the mother left the father shortly before Emily was born and stayed in hotels and with a friend. She lived with the paternal grandparents, respondents Leanne and Charles Harris, for more than a week after Emily was born and then moved into a shelter for battered women. She took Emily to visit the father regularly.
On July 21, 1995, the superior court, pursuant to stipulation of the parties, bifurcated *846 the issues of child custody and visitation and entered judgment dissolving the marriage and granting the mother sole legal and physical custody of Emily, following the recommendation of Dr. O'Roarty. The judgment also provided that the mother could move to Maryland with Emily on or after August 5, 1995. The father was granted supervised visitation contingent on his undergoing psychotherapy, drug testing and attending Narcotics Anonymous meetings. A schedule was established for visitation pending the mother's move to Maryland, which permitted the paternal grandparents to be present. Also by stipulation, the paternal grandparents were joined as parties to the action. They agreed not to interfere with the mother's scheduled move to Maryland.
On August 2, 1995, the paternal grandparents filed a motion for visitation, alleging that the mother would not permit visitation absent a court order. The paternal grandparents asked that Emily spend 10 days at their home every other month. The mother's response noted that Emily was 11 months old and was still nursing. She asked that all visitation take place in Maryland where she was living with her parents and be supervised until the paternal grandparents "get therapy on the issue of abuse." The mother related that the father had been abused by the paternal grandfather, but the paternal grandparents denied this accusation. Family court services counselor Sandra Boyles conducted a mediation session in which the mother participated by telephone and the parties agreed that the paternal grandparents would visit Emily in Maryland for approximately 10 days, six times a year, with no overnight visits. Following a hearing, the court granted the paternal grandparents visitation with Emily in Maryland with no overnight visits and without the father being present as follows: four visits per year for up to seven days each in 1996, six visits per year for up to seven days each in 1997, and six visits per year for up to 10 days each in 1998. The court ordered the grandparents to attend four counseling sessions to address the issue of abuse.
On April 29, 1996, the mother filed a motion to terminate the paternal grandparents' visitation rights, alleging that their visits in January and April of 1996, "were extremely hostile and filled with conflict" and thus had been detrimental to Emily. The mother declared that Emily had nightmares after the paternal grandparents' last visit, cried during her nap times, and clung to the mother "for days after the visits," all of which behavior was unusual for her. The paternal grandparents filed a responsive declaration in which they agreed that the visits had been hostile, but placed the blame on the mother. Following a hearing, the court on October 30, 1996, denied the mother's motion to terminate the paternal grandparents' visitation rights and modified visitation to a maximum of four visits per year for a maximum of seven days each time, to continue until further order of the court.
On November 1, 1996, the paternal grandparents provided the mother with 30 days' notice of their intention to visit Emily on December 1, 1996, but received no response. They traveled to the mother's residence in Maryland and discovered that the mother and Emily had moved. The paternal grandparents hired several private investigators who, many months later, located the mother and the maternal grandparents in Utah. The mother had married Mark Butler, who had six children. The paternal grandparents contacted the mother and she agreed to visitation, which took place in mid-January 1998.
On January 20, 1998, the court found the mother in contempt for failing to comply with the court's orders that she keep the *847 paternal grandparents informed of her current address and permit the scheduled visitation. The court placed the mother on probation for two years. On July 21, 1998, the mother was ordered to pay $7,555 in attorney fees and expenses to the paternal grandparents, and the visitation order was modified to permit visitation within a 50-mile radius of the mother's home in Utah.
The paternal grandparents had week-long visits with Emily in Utah in April, July, and October of 1998. The paternal grandparents asked the mother if they could bring Emily, then 4 years old, to California on their next visit, but the Mother declined, saying she was "not comfortable sending Emily to California." In January of 1999, the paternal grandparents again visited Emily in Utah for seven days. The mother did not permit overnight visits.
On February 9, 1999, the paternal grandparents filed a motion to modify the visitation order to permit them to bring Emily to California for visitation and to permit overnight visits in Utah. On February 24, 1999, the father joined the paternal grandparents' request for visitation in California so that the father could visit Emily while she was in the care of his parents.
On March 17, 1999, pursuant to court order, the mother, the father, and the paternal grandparents met with family court services counselor Sandra Boyles. The father requested unsupervised visits with Emily or, at least, visits at his parents' home. The father became so agitated and hostile during the conference that Boyles asked him to leave. Boyles recommended that the father be permitted visitation only in the presence of a trained supervisor and that Emily not have contact with her father while in the care of her paternal grandparents. Boyles recommended that the paternal grandparents continue to have week-long visits with Emily four times per year until she started school. The next visit was to be in Utah, and Emily was to spend the week with the grandparents at a hotel. Subsequent visits were to be at the grandparents' home in California.
On March 31, 1999, the mother filed a declaration objecting to the recommendation that Emily visit the paternal grandparents in California on the ground that the grandparents would not be able to protect Emily from her father, who was violent, had abused the mother, and had threatened to take Emily.
At a hearing on May 5, 1999, the court observed that it understood why the mother was apprehensive about permitting Emily to visit the paternal grandparents in California, but added: "I don't share that apprehension at all." The court adopted Boyles's recommendations permitting the paternal grandparents to have week-long visits with Emily four times per year until she started school, with the next visit to take place in Utah and subsequent visits to take place in California. The court ordered the grandparents to permit no contact between Emily and her father during these visits. The grandparents visited Emily in Utah for a week in April, 1999 and Emily visited the grandparents' home in California in October, 1999 and January, 2000.
By letter dated February 5, 2000, the father informed the mother that he had moved into his parents' home. The paternal grandparents indicated that, nevertheless, the father would have no contact with Emily during her next visit.
On May 26, 2000, the paternal grandparents filed an order to show cause for visitation beginning when Emily started kindergarten in August 2000. The grandparents alleged they had had their fourth week-long visit with Emily in California in April *848 and were planning another before Emily started school. The grandparents requested the following visitation: two weeks in August, one week during Christmas/New Years, one week during Easter, and one week during June.
In a responsive declaration filed on June 12, 2000, the mother objected to court-ordered visitation, noting that she never would prevent Emily from being with her paternal grandparents, but believed it was wrong to force Emily to leave her family against her will. In her supporting points and authorities, the mother asked that the paternal grandparents' request for visitation be denied.
On June 19, 2000, the mother, the father, and the paternal grandparents participated in a mediation session with family court services counselor James Bruce. The mother wanted to limit the length of Emily's visits to one week. She reluctantly agreed to a two-week visit in June, but wanted one week in August and no visit during the Christmas holiday. Bruce opined that "the minor benefits from contact with the paternal grandparents and that it is in her best interest to continue to have contact with them." He noted that the mother did not dispute that Emily's contact with her paternal grandparents was beneficial, but believed such contact should not be court ordered. Bruce made the following recommendations, noting they were "admittedly arbitrary because the undersigned has not met Emily and does not know her temperament": visitation for 10 to 11 days twice during the summer. He deferred "to the wisdom of the court" regarding visitation during the Christmas holiday.
At a hearing on July 10, 2000, the court stated that it would apply "a best interest standard" that focused on the "health, safety and welfare" of the child. The court remarked that it did not question the mother's motivation to end court-ordered visitation by the paternal grandparents: "I do think she believes that it is best for this child if she provides the family unit and she makes the decisions as to what contact, if any, would exist between other people and this child." Regarding the paternal grandparents, the court stated its belief that "they truly love this child and they care about the child and that they want to continue to have that relationship and that it is very important to them." The court concluded: "I think presently, at least, that it is in the best interest of this child to continue to have a significant relationship with the grandparents," adding that the court did not believe "there is any realistic possibility that if I leave this to the mother's good graces, essentially as the parent, that she would do anything to encourage the relationship in spite of what she says. Her actions are absolutely contrary to that. . . ." The court acknowledged that visitation created practical problems for the Butler family, but concluded the difficulties did not justify cutting off the grandparents' visitation, concluding "that the rewards for the child are greater than any deficits that we have." The court noted that its conclusions were "tough calls because I do have to acknowledge that the grandparents are interfering to some degree with the mother's rights as a parent to the extent they exist to raise children. . . ."
The court awarded the paternal grandparents visitation for 12 days in August, 12 days in June, and from December 26 to 31. The court ordered that Emily fly unaccompanied to California on a nonstop flight beginning with the December visit if permitted by the airlines to do so, and required the mother to take Emily to the *849 airport in Utah and pick her up.[1] The paternal grandparents further were permitted to take Emily to visit other relatives in or out of California.
The mother appealed and the Court of Appeal reversed, holding that the visitation order denied the mother due process of law under both the federal and California Constitutions, explaining that the paternal grandparents should have been required "to show by clear and convincing evidence that the parents' decision [to deny or limit visitation] would be detrimental to the child."
At the request of the mother, and without objection by the paternal grandparents, we have taken judicial notice of the fact that after this court granted review, the superior court, on October 28, 2002, terminated the father's parental rights.

II. Discussion
Grandparents' rights to court-ordered visitation with their grandchildren are purely statutory. (White v. Jacobs (1988) 198 Cal.App.3d 122, 124-125, 243 Cal.Rptr. 597.) Three California statutes expressly address grandparent visitation: Family Code section 3102,[2] which permits visitation by a deceased parent's children, siblings, parents, and grandparents if such visitation would be in the best interests of the child; section 3103,[3] which permits a court in specified proceedings involving the custody of a child to grant grandparent visitation; and section 3104,[4] which permits *850 grandparents to petition for visitation if the grandchild's parents are not married or if certain other conditions are met.[5]
We first must determine which statute controls in this case. Section 3102 does not apply because neither parent is deceased.
Section 3103 provides that in specified proceedings involving the custody of a child, including proceedings for dissolution of marriage, "the court may grant reasonable visitation to a grandparent of a minor child of a party to the proceeding if the court determines that visitation by the grandparent is in the best interest of the child." (§ 3103, subd. (a).) The visitation order in the present case was issued in a proceeding for dissolution of marriage, but it was issued years after a judgment had been entered dissolving the marriage and awarding sole custody of the child to the mother.
Section 3104 permits a grandparent to petition a court for visitation if the child's parents are not married or are living separately or if certain other conditions apply. (§ 3104, subd. (b).) The court may grant reasonable visitation if the court "[f]inds that there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child" and "[b]alances the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority." (§ 3104, subd. (a).)
Both section 3103 and section 3104 provide a rebuttable presumption that grandparent visitation is not in the child's best interest, if the parents agree that the grandparents should not be granted visitation. (§§ 3103, subd. (d), 3104, subd. (e).) Neither of these provisions apply in this case, however, because Emily's father supports the paternal grandparents' request for visitation rights.[6]
Section 3104 further applies the same rebuttable presumption against visitation "if the parent who has been awarded sole legal and physical custody of the child in another proceeding . . . objects to visitation by the grandparent." (§ 3104, subd. (f).) Section 3103 contains no similar provision addressing the situation in which a parent has been awarded sole custody of the child.
The grandparents argue that section 3103 is the controlling statute. Section 3103 applies "[n]otwithstanding any other provision of law, in a proceeding described in Section 3021," which includes "[a] proceeding for dissolution of marriage."[7] As *851 noted above, the present action is a proceeding for dissolution of marriage, but the order for grandparent visitation was made several years after judgment had been entered dissolving the marriage and granting sole custody of Emily to the mother. We must determine, therefore, whether the Legislature intended section 3103 to apply in marriage dissolution proceedings after entry of judgment dissolving the marriage and awarding custody of the child.
"The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.]" (People v. Pieters (1991) 52 Cal.3d 894, 898, 276 Cal.Rptr. 918, 802 P.2d 420.) But we also have held that "`[i]t is a fundamental rule of statutory construction that statutes should be construed to avoid anomalies.'" (Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 64, 124 Cal.Rptr.2d 507, 52 P.3d 685.) "Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]" (Palos Verdes Faculty Assn. v. Palos Verdes Peninsula Unified Sch. Dist. (1978) 21 Cal.3d 650, 659, 147 Cal.Rptr. 359, 580 P.2d 1155.) "Thus, `[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute `with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (People v. Pieters, supra, 52 Cal.3d at p. 899, 276 Cal.Rptr. 918, 802 P.2d 420; Brown v. Superior Court (1984) 37 Cal.3d 477, 485, 208 Cal.Rptr. 724, 691 P.2d 272.)
Considering section 3103 in light of section 3104, it appears that in marriage dissolution proceedings, the Legislature intended section 3103 to govern grandparent visitation only until entry of a judgment dissolving the marriage and awarding custody of the child. This construction of section 3103 furthers the Legislature's intent for the following reasons.
The apparent purpose of section 3103 is to permit a court to grant grandparent visitation during the pendency of certain judicial proceedings involving custody of the child. This permits the court in a marriage dissolution action, for example, to consider grandparent visitation when fashioning its custody and visitation orders. But the situation changes once the marriage has been dissolved and custody of the child and any visitation orders have been determined by entry of judgment. Although the court retains jurisdiction to modify its custody and visitation orders upon a showing of changed circumstances at any time while the child remains a minor (Burchard v. Garay (1986) 42 Cal.3d 531, 535, 229 Cal.Rptr. 800, 724 P.2d 486), it would make little sense to permit grandparents to seek a visitation order in a marriage dissolution proceeding after a judgment dissolving the marriage and awarding custody of the child has been entered. If we so construed section 3103, it would permit a grandparent to seek visitation in a marriage dissolution proceeding at any time until the child becomes *852 an adult. It appears, instead, that the Legislature intended that once a judgment dissolving the marriage and awarding custody of the child has been entered, the provisions of section 3104 would govern whether the grandparents should be granted visitation. This conclusion is supported by the circumstance that section 3104 permits a grandparent to petition for visitation if the parents are not married. The provisions of section 3104 thus come into play once a judgment dissolving the marriage and determining custody of the child has been entered.
Our conclusion also is supported by the circumstance that section 3104, and not section 3103, contains a provision addressing the situation in which a parent has been granted sole custody of the child. As noted above, both statutes contain a rebuttable presumption against grandparent visitation if the parents agree that such visitation should be denied. But only 3104 also applies a rebuttable presumption against grandparent visitation if the parent granted sole custody of the child objects. We conclude that the Legislature did not include a similar provision in section 3103 because it would not be needed during marriage dissolution proceedings before a judgment awarding custody had been entered. There would be no need to include such a provision in section 3103 if, as we conclude, a request for grandparent visitation is governed by section 3104 once a judgment has been entered dissolving the marriage and awarding sole custody of the child to one parent.
Our construction prevents the anomalous result of applying a rebuttable presumption against grandparent visitation if a parent granted sole custody objects to a petition filed under section 3104, but not if the court grants such visitation in a marriage dissolution proceeding under section 3103. It is difficult to imagine why the Legislature would intend the presumption to apply in one circumstance but not the other.
We conclude, therefore, that the present case is governed by section 3104.
The mother contends that section 3104 is unconstitutional both on its face and as applied in this case, because it unduly burdens her parental liberty interest in the custody, care, and control of her child. We first address the mother's claim under the federal Constitution.
A sharply divided United States Supreme Court addressed the thorny issue of grandparent visitation in Troxel v. Granville, supra, 530 U.S. 57, 60, 120 S.Ct. 2054, considering a Washington statute that permitted "`[a]ny person'" to petition the superior court for visitation rights "`at any time'" and authorized the court to grant such visitation if it would "`serve the best interest of the child.'" The paternal grandparents petitioned for visitation with their two granddaughters after their son committed suicide and the children's mother notified them she wished to limit their visitation with her daughters to one short visit a month. The parents had never married and had separated two years before the father died. Before his death, the father had lived with the paternal grandparents and had regularly brought his daughters to his parents' home for weekend visits.
Justice O'Connor's plurality opinion in Troxel, in which Chief Justice Rehnquist, and Justices Ginsburg and Breyer joined, observed that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (Troxel v. Granville, supra, 530 U.S. 57, 66, 120 S.Ct. 2054.) The plurality opinion concluded that the Washington statute, as applied in that case, violated that fundamental liberty *853 interest. (Id. at p. 67, 120 S.Ct. 2054.) The plurality stated: "[T]here is a presumption that fit parents act in the best interests of their children." (Id. at p. 68, 120 S.Ct. 2054.) "Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. [Citation.]" (Id. at pp. 68-69, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).)
But the plurality did not prohibit the state from ordering grandparent visitation, stating instead: "The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests." (Troxel v. Granville, supra, 530 U.S. 57, 69, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).) To the contrary, "[t]he judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be `impact[ed] adversely.' In effect, the judge placed on [the mother], the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters." (Ibid.)
Noting that "the court's presumption failed to provide any protection for [the mother's] fundamental constitutional right to make decisions concerning the rearing of her own daughters," the plurality included a "cf." cite to section 3104, subdivision (e), which, as noted above, creates a "rebuttable presumption that grandparent visitation is not in [the] child's best interest if [the] parents agree that visitation rights should not be granted." (Troxel v. Granville, supra, 530 U.S. 57, 69-70, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).)
The plurality in Troxel concluded that the Washington statute failed to give sufficient weight to the parent's judgment concerning the wisdom of grandparent visitation: "[T]he decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." (Troxel v. Granville, supra, 530 U.S. 57, 70, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).) The plurality was careful to note, moreover, "that there is no allegation that [the mother] ever sought to cut off visitation entirely." (Id. at p. 71, 120 S.Ct. 2054.) The plurality firmly stated that a court may not simply substitute for the parent's judgment its own judgment of what is best for the child: "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made." (Id. at pp. 72-73, 120 S.Ct. 2054.)
Although concluding that the Washington statute was unconstitutional, the plurality adopted a cautious approach in this sensitive area of law: "Because we rest our decision on the sweeping breadth of [the Washington statute] and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court  whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. We do not, and need not, define today the precise scope of the parental due process right in the visitation context. . . . [T]he constitutional protections in this area are best `elaborated with care.'" (Troxel v. *854 Granville, supra, 530 U.S. 57, 73, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).)
Justice Souter concurred in the judgment, but would have affirmed the Washington Supreme Court's ruling that the statute is unconstitutional on its face, saying the case does not "call for turning any fresh furrows in the `treacherous field' of substantive due process. [Citation.]" (Troxel v. Granville, supra, 530 U.S. 57, 76, 120 S.Ct. 2054 (conc. opn. of Souter, J.).) "We have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment. [Citations.]" (Id. at p. 77, 120 S.Ct. 2054.) A parent's right includes "the right to be free of judicially compelled visitation by `any party' at `any time' a judge believed he `could make a "better" decision than the objecting parent had done.'" (Id. at p. 78, 120 S.Ct. 2054.)
Justice Thomas concurred that parents have a fundamental right "to direct the upbringing of their children." (Troxel v. Granville, supra, 530 U.S. 57, 80, 120 S.Ct. 2054 (conc. opn. of Thomas, J.).) He would have applied a strict scrutiny standard of review, concluding that the State of Washington "lacks even a legitimate governmental interest  to say nothing of a compelling one  in second-guessing a fit parent's decision regarding visitation with third parties." (Id. at p. 80, 120 S.Ct. 2054.)
The decision in Troxel does not support the mother's argument here that section 3104 is unconstitutional on its face. Section 3104 is significantly different from the Washington statute at issue in Troxel. The Washington statute was, in the words of the plurality in Troxel, "breathtakingly broad," permitting "`[a]ny person'" to petition the superior court for visitation rights "`at any time.'" (Troxel v. Granville, supra, 530 U.S. 57, 67, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.), italics omitted.) Section 3104 is more narrow, permitting grandparents of a minor child to petition the court for visitation rights only if the child's parents are not married or are separated or if other similar conditions apply. Section 3104 requires that there be "a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child" and directs the court to balance "the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority" before ordering grandparent visitation. As the Court of Appeal stated in Lopez v. Martinez (2000) 85 Cal.App.4th 279, 287-288, 102 Cal.Rptr.2d 71: "It can hardly be said the California statute at issue in this case comes even close to being so `breathtakingly broad' as to be unconstitutional. On the contrary, it explicitly limits the situations and circumstances in which grandparents can petition for visitation rights. Even when grandparents are statutorily given standing to petition for visitation rights, there is always a rebuttable presumption in favor of the parents when the parents conclude visitation is not in the best interests of the child. (§ 3104, subds.(e), (f).) The result is a balance between the child's interest in the grand-parental relationship and the right of the parents to rear their own child as they see fit."
As the Court of Appeal recognized in Lopez v. Martinez, supra, 85 Cal.App.4th 279, 288, 102 Cal.Rptr.2d 71, the Legislature limited section 3104 by creating rebuttable presumptions against grandparent visitation "if the child's parents agree that the grandparent should not be granted visitation rights" (§ 3104, subd. (e)), or if the parent awarded sole custody objects *855 to grandparent visitation (§ 3104, subd. (f)). These provisions prevent the situation that arose in Troxel in which the court ordered visitation over the objection of the child's sole surviving fit parent based upon a finding that such visitation was in the child's best interest. Unlike the Washington statute at issue in Troxel, section 3104 gives "special weight" to the parents' decision, if the parents agree that visitation is not in their child's best interest, or to the decision of a parent who has been awarded sole custody of the child. The high court recognized as much by citing with approval section 3104, subdivision (e). (Troxel v. Granville, supra, 530 U.S. 57, 70, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).)
Accordingly, section 3104 does not suffer from the constitutional infirmities that plagued the Washington statute considered in Troxel. Section 3104 does not violate the federal Constitution on its face, as Justice Souter concluded the Washington statute did, because it does not permit "judicially compelled visitation by `any party' at `any time' a judge believed he `could make a "better" decision' than the objecting parent had done." (Troxel v. Granville, supra, 530 U.S. 57, 78, 120 S.Ct. 2054 (conc. opn. of Souter, J.).) Section 3104 permits only grandparents to seek visitation and only if the parents are not married or are separated or if other specified circumstances exist. It requires that there be "a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child," directs the court to balance "the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority" and creates rebuttable presumptions against visitation if the parents agree that grandparent visitation is not in their child's best interest or a parent with sole custody of the child objects to grandparent visitation. (Ibid.)
Neither does the decision in Troxel support the mother's argument here that section 3104 violates the federal Constitution as applied in this case. Troxel involved an order for grandparent visitation that was opposed by the child's sole surviving fit parent. That was not the situation before the superior court in this case when it issued the visitation order under review. Rather, the parents of the child in the present case disagreed concerning grandparent visitation, and the father had not been declared unfit and his parental rights had not yet been terminated. Nothing in the decision in Troxel suggests that an order for grandparent visitation that is supported by one parent infringes upon the parental rights of the other parent.
The mother attempts to equate herself to a sole surviving parent by describing the father as "uninterested" and asserting, without explanation or citation of authority, that he is "akin" to a deceased parent. We disagree. The father in the present case is alive and, as noted above, at the time of the visitation order at issue here, his parental rights had not been terminated. The mother had been awarded sole legal and physical custody of Emily, but this did not terminate the father's parental rights, nor did it terminate his due process interest in parenting. (See, e.g., Hoversten v. Superior Court (1999) 74 Cal. App.4th 636, 641, 88 Cal.Rptr.2d 197 [acknowledging the constitutional interest of an incarcerated parent in visitation with his child].) An order granting a parent sole legal custody "means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (§ 3006) This is different from, and far less drastic than, an order declaring a minor free from the control of a parent, which *856 "terminates all parental rights and responsibilities with regard to the child" (§ 7803) and leaves the child eligible for adoption. (In re Marriage of O'Connell (1978) 80 Cal.App.3d 849, 854, 146 Cal.Rptr. 26; see County of Ventura v. Gonzales (2001) 88 Cal.App.4th 1120, 1123-1124, 106 Cal. Rptr.2d 461 [dicta]; In re Marriage of Dunmore (2000) 83 Cal.App.4th 1, 5, 98 Cal.Rptr.2d 885 [a father's obligation to support his child does not cease until his parental rights are terminated].)
Court-ordered grandparent visitation over the objection of a sole surviving parent implicates that parent's right to the custody and control of his or her child. (Troxel, supra, 530 U.S. 57, 66, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.); Punsly v. Ho (2001) 87 Cal.App.4th 1099, 105 Cal. Rptr.2d 139; Kyle O. v. Donald R. (2000) 85 Cal.App.4th 848, 102 Cal.Rptr.2d 476.) But the mother in the present case has cited no authority that holds that an order for grandparent visitation that is supported by one of the parents infringes upon the parental rights of the other parent.
In his concurring and dissenting opinion, Justice Chin concludes that the father's support of the grandparents' request for visitation "is legally irrelevant and does not affect the constitutional protection to which [the mother], as Emily's sole legal custodian, is entitled against state interference with her parenting decisions." (Conc. and dis. opn. of Chin, J., post, 17 Cal.Rptr.3d at p. 866, 96 P.3d at p. 160.) But with the exception of two out-of-state cases (In re Marriage of Howard (Iowa 2003) 661 N.W.2d 183; Rust v. Rust (Tenn.Ct.App.1993) 864 S.W.2d 52, 53), the decisions cited in support of this proposition discuss the rights of both parents to control the manner in which they should rear their child, or the rights of a sole surviving parent, and do not support the conclusion that one parent has a due process right that may be infringed if a third party is granted visitation with the child with the consent of the other parent. As the plurality opinion in Troxel cautioned, we should be very careful in identifying the scope of the due process interest in parenting. (Troxel v. Granville, supra, 530 U.S. 57, 72-73, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.) ["we agree with Justice Kennedy that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best `elaborated with care.'"].)
In his concurring and dissenting opinion, Justice Baxter concludes that "[t]he majority errs in reaching out to consider and reject the mother's as-applied constitutional challenge to section 3104(f)." (Conc. and dis. opn. of Baxter, J., post, 17 Cal. Rptr.3d at p. 858, 96 P.3d at p. 154.) It can hardly be said that we are "reaching out" to decide this issue. The Court of Appeal held that section 3104 is unconstitutional as applied in this case. We granted review to resolve that issue, among others.
Justice Baxter's concurring and dissenting opinion cites, in support of his assertion that it is improper for us to decide whether the statute is unconstitutional as applied, the observation in Bowen v. Kendrick (1989) 487 U.S. 589, 600, 108 S.Ct. 2562, 101 L.Ed.2d 520, that "only a facial challenge could have been considered, as the Act had not been implemented." The high court was referring to its earlier decision in Edwards v. Aguillard (1987) 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510, which involved a facial challenge to Louisiana's "Creationism Act." The opinion in Edwards notes that the state officials in that case "agreed not to implement the Creationism Act pending the final outcome *857 of this litigation." (Id. at p. 581, fn. 1, 107 S.Ct. 2573.) The present case, unlike Edwards, involves a specific application of the challenged statute.
Justice Baxter's concurring and dissenting opinion also cites our opinion in Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1085, 40 Cal.Rptr.2d 402, 892 P.2d 1145, for the proposition that an "as applied" challenge may be brought only if there is "a present impermissible application of the challenged statute or ordinance which the court can remedy." (Conc. & dis. opn. of Baxter, J., post, 17 Cal.Rptr.3d at p. 859, 96 P.3d at pp. 154-155.) But Tobe involved an application for mandamus to bar enforcement of a local ordinance. (Tobe, at p. 1082, fn. 5, 40 Cal.Rptr.2d 402, 892 P.2d 1145.) We held that only a facial challenge to the ordinance had been perfected because the petitioners sought to bar any enforcement of the ordinance and had not successfully raised the issue that the ordinance had been enforced in an unconstitutional manner in a particular case. (Id. at pp. 1092-1093, 40 Cal.Rptr.2d 402, 892 P.2d 1145.) Similarly, Tunstall ex rel. Tunstall v. Bergeson (2000) 141 Wash.2d 201, 5 P.3d 691, 703, relied upon by the concurring and dissenting opinion, held that prison inmates failed to perfect an "as applied" challenge to a Washington statute because they "fail[ed] to provide any specific facts demonstrating that the State's application of [the statute] has violated article IX [of the Washington Constitution]. Rather, the inmates merely speculate about constitutional problems that could result from [the statute]'s application."
Although we conclude that the superior court erred in failing to utilize the rebuttable presumption in section 3104, subdivision (f), it remains the case that the superior court did apply the statute and, thus, it is proper for this court to determine whether section 3104 is constitutional as applied in this case.
In addition to her reliance upon the federal Constitution, the mother also bases her attack on section 3104 upon the California Constitution, citing our decisions in Conservatorship of Wendland (2001) 26 Cal.4th 519, 110 Cal.Rptr.2d 412, 28 P.3d 151, American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, and Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633. Each of these cases applies the explicit guarantee of the right of privacy in the California Constitution (Cal. Const., art. I, § 1), but none does so in a context similar to the present case. Conservatorship of Wendland, supra, 26 Cal.4th 519, 531-532, 110 Cal.Rptr.2d 412, 28 P.3d 151, involved the right to refuse medical treatment ("`The constitutional right of privacy guarantees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity'"). American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th 307, 332, 66 Cal. Rptr.2d 210, 940 P.2d 797, involved the right of a pregnant minor to obtain an abortion without parental consent ("[T]he interest in autonomy privacy protected by the California constitutional privacy clause includes a pregnant woman's right to choose whether or not to continue her pregnancy [citations]"). And Hill v. National Collegiate Athletic Assn., supra, 7 Cal.4th 1, 35, 26 Cal.Rptr.2d 834, 865 P.2d 633, involved compulsory drug tests for college athletes ("Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information (`informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference *858 (`autonomy privacy')"). None of these cases support the mother's argument that an order for grandparent visitation that is supported by one parent infringes upon the parental rights of the other parent.
We conclude, therefore, that section 3104 does not violate the federal or California Constitutions, either on its face or as applied.
As noted above, subdivision (f) of section 3104 creates "a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the parent who has been awarded sole legal and physical custody of the child . . . objects to visitation by the grandparent." In the present case, the mother was awarded sole custody of Emily and objected to grandparent visitation. Accordingly, the grandparents were required to overcome a rebuttable presumption that visitation is not in Emily's best interest. The record before us reflects that the superior court did not consider this presumption, but rather expressly utilized a "best interest of the child" standard. Accordingly, we will remand this case to the superior court to reconsider the visitation order in light of the presumption that grandparent visitation is not in Emily's best interest.[8]

III. Disposition
We affirm the judgment of the Court of Appeal to the extent it reversed the order for grandparent visitation. The matter is remanded to the Court of Appeal with directions to remand the matter to the superior court for reconsideration of the order for grandparent visitation in light of the views expressed in this opinion and the superior court's subsequent order terminating the father's parental rights.
WE CONCUR: GEORGE, C.J., KENNARD and WERDEGAR, JJ.
Concurring and Dissenting Opinion by BAXTER, J.
I concur in the judgment sustaining Family Code section 3104, subdivision (f) (section 3104(f)) against a facial challenge under the state and federal Constitutions; vacating the grandparent visitation order presented here on the ground the superior court failed to apply section 3104(f); and remanding the matter to the superior court for it to apply section 3104(f) in the first instance. However, I respectfully decline to join the majority opinion for two reasons:
1. The majority errs in reaching out to consider and reject the mother's as-applied constitutional challenge to section 3104(f). (See maj. opn., ante, 17 Cal. Rptr.3d at pp. 854-856, 96 P.3d at pp. 151-152.) An "as-applied challenge" is "a claim that a statute is unconstitutional on the facts of a particular case or to a particular party." (Black's Law Dictionary (7th ed.1999) p. 223, col. 1.) An essential predicate for an as-applied challenge is that the statute actually have been applied. (See Bowen v. Kendrick (1988) 487 U.S. 589, 600, 108 S.Ct. 2562, 101 L.Ed.2d 520 ["only a facial challenge could have been considered, *859 as the Act had not been implemented"]; accord, Tunstall ex rel. Tunstall v. Bergeson (2000) 141 Wash.2d 201, 5 P.3d 691, 703 ["Under an `as applied' challenge, the party challenging the statute contends that the statute, as actually applied, violated the constitution"].) That is, "there must be a present impermissible application of the challenged statute or ordinance which the court can remedy." (Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1085, 40 Cal.Rptr.2d 402, 892 P.2d 1145 (Tobe), italics added.) Yet the majority holds (and I agree) that the superior court did not apply section 3104(f), which shifts the burden to the grandparents to rebut the presumption that visitation is not in the best interest of the child, and instead mistakenly analyzed the question under a naked "`best interest of the child' standard" without according the mother's decision a presumption of correctness. (Maj. opn., ante, 17 Cal.Rptr.3d at p. 858, 96 P.3d at p. 154.) Because the superior court erred in failing to adhere to the statute and a remand is necessary for that court to apply the statute correctly in the first instance, it is not yet possible to determine whether a hypothetical future order of visitation  if one should be entered  will give "special weight" to the mother's objections. Likewise, it is not yet known whether the scope and duration of any hypothetical visitation order will raise constitutional concerns. Indeed, the court on remand might decide not to grant visitation at all.
Until the statute is actually (and correctly) applied, it is impossible to know whether an order of visitation will be entered and, if so, its justification and scope. Obviously, the validity of any hypothetical future order will depend on an "analysis of the facts of [the] particular case . . . to determine the circumstances in which the statute or ordinance has been applied and . . . whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right." (Tobe, supra, 9 Cal.4th at p. 1084, 40 Cal.Rptr.2d 402, 892 P.2d 1145, italics added.) Without an actual application of the statute, however, I do not understand how the as-applied analysis can proceed. (See id. at p. 1111, 40 Cal.Rptr.2d 402, 892 P.2d 1145 (conc. opn. of Werdegar, J.).) Nor does the majority cite any authority for deciding an as-applied challenge to a statute where the statute has not yet been correctly applied.
But the majority's error is not merely that it has purported to consider and reject the mother's as-applied challenge to a statute even though we already have, on statutory grounds, vacated the very order that is the subject of her constitutional challenge. The more serious error is that in so doing, the majority has disregarded the fundamental principle of constitutional adjudication that "`we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us.' [Citations.] As the United States Supreme Court reiterated, `A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.' [Citation.] Applying that principle, the high court observed that if statutory relief had been adequate in the case before it, `a constitutional decision would have been unnecessary and therefore inappropriate.'" (Santa Clara County Local Transportation Authority v. Guardino (1995) 11 Cal.4th 220, 230-231, 45 Cal.Rptr.2d 207, 902 P.2d 225; see also Thompson v. Department of Corrections (2001) 25 Cal.4th 117, 128-129, 105 Cal.Rptr.2d 46, 18 P.3d 1198; accord, Three Affiliated Tribes v. Wold Engineering (1984) 467 U.S. 138, 157-158, 104 S.Ct. 2267, 81 L.Ed.2d 113.) In this case, our finding of statutory error renders it unnecessary (and therefore inappropriate) *860 to address the mother's claim that the statute is unconstitutional as applied. Especially in this area  where the high court has cautioned that the constitutional protections "are best `elaborated with care'" (Troxel v. Granville (2000) 530 U.S. 57, 73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (Troxel) (plur. opn. of O'Connor, J.), quoting id. at p. 101, 120 S.Ct. 2054 (dis. opn. of Kennedy, J.))  I cannot fathom a justification for preemptive action. Tellingly, the majority offers none, other than to say that "[i]f we agreed with the mother that section 3104 is unconstitutional as applied to a parent such as herself who has been granted sole custody of the child, there would be no need to remand the matter." (Maj. opn., ante, 17 Cal.Rptr.3d at p. 858, fn. 8, 96 P.3d at p. 154, fn. 8.) But if the court on remand declines to order visitation, there will be no need to consider the constitutional question at all. Judicial restraint is a policy of avoiding the unnecessary resolution of constitutional questions, not a policy of avoiding remands.
Until today, judicial restraint had led us to construe statutes, if possible, so as to avoid constitutional questions. (E.g., Miller v. Municipal Court (1943) 22 Cal.2d 818, 828, 142 P.2d 297; accord, New York v. Ferber (1982) 458 U.S. 747, 769, fn. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113.) The contrapositive policy adopted by the majority  i.e., that it is better to construe the Constitution than await the construction of a statute  mischievously undermines judicial restraint. I dissent strongly from this new policy.
2. The majority's categorical declaration that the mother has no federal or state constitutional interest at stake in this proceeding is bereft of legal authority and is far broader than is needed to decide this case. The majority rejects the mother's as-applied challenge under the federal Constitution and the entirety of her state constitutional claim at the threshold: In the majority's view, a court order granting third parties visitation with the child over the objection of the custodial parent implicates no constitutional right of the custodial parent, as long as the order is endorsed by the noncustodial parent. (Maj. opn., ante, 17 Cal.Rptr.3d at pp. 855-856, 96 P.3d at pp. 151-152.)
I do not know whether the majority is correct, although I observe that the majority fails to support its holding with citation to any legal authority or scholarly commentary and that neither party, nor their amici curiae, have contended that the mother has no constitutional rights here.[1] Moreover, under the majority's approach, a custodial parent would have no constitutional protection whatsoever if a state overrode that parent's objections and forced his or her child to go on visits with any third party  even with complete strangers, and even if such visitation was demonstrably harmful to the child  as long as the noncustodial parent acquiesced in the court order.
What is so disappointing is that this startling and novel conclusion is wholly unnecessary. As the majority elsewhere acknowledges, section 3104(f) is "[u]nlike the Washington statute at issue in Troxel" in that it "gives `special weight' to . . . the decision of a parent who has been awarded sole custody of the child" and therefore "does not suffer from the constitutional infirmities that plagued the Washington statute considered in Troxel." (Maj. opn., ante, 17 Cal.Rptr.3d at pp. 854-855, 96 P.3d at pp. 151-152.) In particular, the majority has determined that the protections *861 in section 3104(f) "prevent the situation that arose in Troxel in which the court ordered visitation over the objection of the child's sole surviving fit parent" based on nothing more than the court's own assessment of the child's best interest. (Maj. opn., ante, at p. 855, 96 P.3d at p. 152.) In sum, the majority has determined that section 3104(f) adequately protects even the rights of a child's sole surviving parent from unwarranted intrusion by court-ordered grandparent visitation. It therefore follows that the statute adequately protects a sole custodial parent (like the mother here), whose rights are certainly no greater than those of the sole surviving fit parent in Troxel.
For similar reasons, I believe the majority is also premature in holding that court-ordered grandparent visitation that is supported by a noncustodial parent implicates no right of privacy of the custodial parent under the California Constitution. Instead, I would reject the mother's facial challenge under well-settled law. Under our precedents, a statute may be invalidated on its face as violative of the state constitutional right to privacy only if the invasion of privacy is "sufficiently serious in [its] nature, scope, and actual or potential impact [as] to constitute an egregious breach of the social norms underlying the privacy right" (Hill v. National Collegiate Athletic Assn. (1994) 7 Cal.4th 1, 37, 26 Cal.Rptr.2d 834, 865 P.2d 633, italics added) in at least "the vast majority of its applications." (American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 343, 66 Cal.Rptr.2d 210, 940 P.2d 797 (plur. opn. of George, C.J.).)[2] But section 3104, which requires the trial court to consider the right of a parent to exercise his or her authority in each instance before ordering grandparent visitation, applies also where the grandparents have been acting as de facto parents or where the grandparents seek to preserve an existing bond only through brief and infrequent visitation  and the mother has not shown that the statute would necessarily be unconstitutional in either instance. (Cf. In re G.P.C. (Mo.Ct.App.2000) 28 S.W.3d 357, 365 [a two-hour supervised visit every three months "creates a minuscule intrusion into Parents' lives"].) Accordingly, I would hold that the mother has not shouldered her burden to prove that section 3104(f) is unconstitutional on its face and would reserve judgment on her as-applied challenge until the statute is actually applied to her. Furthermore, I would leave for another day the broader issue of whether a sole custodial parent has any state constitutional protection at all against court-ordered visitation by third parties.
Because the majority has needlessly opined on these major constitutional issues without the aid of any legal authority and in defiance of fundamental canons of constitutional adjudication, I respectfully dissent from that portion of the majority opinion.
Concurring and Dissenting Opinion by CHIN, J.
I concur in the majority's conclusion that under the circumstances of this case, *862 Family Code section 3104[1] governs the request of respondents Leanne Harris and Charles Harris, Jr. (Grandparents) for visitation with their granddaughter Emily.
However, I disagree with the majority's unprecedented and troubling conclusion that if a noncustodial parent supports a grandparent's visitation request, a visitation order like the one at issue here  which required a six-year-old child to fly unaccompanied to another state and effectively transferred her custody to a non parent in another state for extended time periods  does not even implicate a custodial parent's constitutional right. This conclusion finds no support in the decisions of the high court and is contrary to case law both in California and elsewhere. In my view, the relevant authority establishes that court-ordered visitation by a grandparent against the wishes of a fit custodial parent infringes on that parent's fundamental right to direct his or her child's upbringing, and that this state infringement on a parent's fundamental right is unconstitutional absent clear and convincing evidence to rebut the presumption under section 3104, subdivision (f), that such visitation is not in the child's best interests. I dissent to the extent the majority holds otherwise.

Factual Background
Appellant Karen Butler (Karen) married respondent Charles Erik Harris (Charles) in January 1994. They separated in October 1994, only 10 days before the birth of their daughter, Emily. Karen formally filed for dissolution of marriage in January 1995, asserting that Charles had been psychologically and physically abusive to her. Charles admitted hitting Karen twice after an argument and biting her on another occasion. In July 1995, pursuant to stipulation, the trial court-ordered entry of a judgment of dissolution. The court's order awarded Karen "sole legal custody" and "sole physical" custody of Emily. By statute, the court's award of sole legal custody to Karen bestowed on her the exclusive "right and . . . responsibility to make the decisions relating to the health, education, and welfare of" Emily. (§ 3006.) Similarly, by statute, the court's award to Karen of sole physical custody placed Emily "under" Karen's exclusive "supervision," "subject to the power of the court to order visitation." (§ 3007.) Regarding visitation, the court granted Charles supervised visits if he complied with certain conditions. Finally, the court's order specified that that there would be no change in these arrangements absent "a showing of substantial change in circumstances."
In August 1995, Grandparents were joined "as parties to" the dissolution action pursuant to stipulation. The court's order joining Grandparents provided that they were bound by the terms of the stipulated judgment between Karen and Charles, including the award to Karen of sole legal and physical custody.
During the ensuing years, there were numerous proceedings and court orders involving the question of visitation by Grandparents. In May 1999, the court granted Grandparents week-long visits four times per year until Emily started school, and specified that Grandparents were not to permit Charles to have contact with Emily during those visits. In February 2000, Charles informed Karen that he was living with Grandparents. Nevertheless, Grandparents assured Karen that Charles would have no contact with Emily during her next visit.
Because the court's order of May 1999 governed only until Emily started school, Grandparents filed an order to show cause *863 in May 2000 requesting the following visitation after Emily began kindergarten in August 2000: two weeks in August, one week during the Christmas/New Year's period, one week during Easter, and one week in June. To accomplish these visits, they asked the court to order Karen to put six-year-old Emily on a plane by herself and send her from her home in Salt Lake City to San Diego, where Grandparents lived. They also asked the court for permission to take Emily to visit relatives in Northern California and Missouri upon giving Karen notice and information regarding itinerary and contact numbers. Finally, they asked the court to grant Charles supervised visitation with Emily during her visits with Grandparents.
Karen opposed Grandparents' request. She objected generally that, although she was willing to work out visitation with Grandparents, she did not think visitation should be court ordered. More specifically, she expressed concern that court-ordered visitation would cause Emily to feel that her mother had "no control over what happens to her." Karen also expressed concern that the visits to California uprooted Emily from her new family in Utah and hindered Karen's efforts to integrate Emily into the new family. In her opposition declaration, Karen stated her concern that the extensive court-ordered visitation Grandparents were requesting would "destroy the feeling of belonging that every child needs in order to feel safe and secure with her family in her home." Finally, Karen objected to having a court order her to "put[ ] her . . . six year-old daughter on a plane by herself to go to" visit Grandparents in California.
The trial court granted Grandparents' visitation request. It did not "question[ ]" Karen's "motivation" or the sincerity of her belief that "it is best for this child if [Karen] provides the family unit and she makes the decisions as to what contact, if any, would exist between other people and this child." However, the court was of the "firm belief" that Emily would "be better off with some meaningful relationship with . . . extended family," and it saw no "realistic possibility" that Karen "would do anything to encourage the relationship" between Emily and Grandparents "in spite of what she [said]." Thus, after finding that it was in Emily's "best interest . . . to continue to have a significant relationship with the Grandparents," the court ordered the following: (1) each year, Emily would have to visit Grandparents in San Diego for 12 days in August, from December 26 to 31, and for 12 days in June; (2) starting in December 2000, when Emily was only six years old, Karen would have to put Emily on a plane in Salt Lake City to fly to California by herself; and (3) during Emily's visits, Grandparents could take her to see relatives in California or any other state, and had to inform Karen of Emily's whereabouts only if they took her "out of [San Diego] County overnight."
The Court of Appeal reversed, finding that the visitation order violated both the California and United States Constitutions. The court explained that the governing statute was section 3104, subdivision (f), which provides: "There is a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the parent who has been awarded sole legal and physical custody of the child in another proceeding . . . objects to visitation by the grandparent." The court next held that although the statute, as written, does not violate the federal Constitution, it violates a parent's "fundamental liberty interest" under the state Constitution unless "read" to require enforcement of the custodial parent's decision absent "clear and convincing evidence that the child will suffer harm or potential harm if visitation is *864 not ordered." The court then held that the application of the statute here violated Karen's state and federal constitutional rights because the trial court "did nothing more than apply a bare-bones best interest test and did not accord" Karen's decision "any deference or material weight."

Discussion

A. Custodial Parents Have a Fundamental Constitutional Right to Make Decisions Regarding Their Children.
"`Personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions.' [Citation.]" (In re Roger S. (1977) 19 Cal.3d 921, 927, 141 Cal.Rptr. 298, 569 P.2d 1286.) "[I]nclude[d]" in this "constitutionally protected `liberty'" interest is "the right" of a parent "to `bring up children' [citation] and to `direct [their] upbringing and education.'" (Id. at p. 928, 141 Cal.Rptr. 298, 569 P.2d 1286.) Indeed, we have held that "the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights. [Citations.]" (In re B.G. (1974) 11 Cal.3d 679, 688, 114 Cal.Rptr. 444, 523 P.2d 244.) Similarly, a plurality of the United States Supreme Court recently stated that a parent's "liberty interest . . . in the care, custody, and control of [his or her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by" the high court. (Troxel v. Granville (2000) 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (plur. opn. of O'Connor, J.) (Troxel).) In short, over the years, "constitutional interpretation" by both this court and the high court "has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. `It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'" (Ginsberg v. New York (1968) 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195.) "[T]he state has no general authority to dictate to parents the manner in which they should rear their children." (In re Marriage of Wellman (1980) 104 Cal.App.3d 992, 996, 164 Cal.Rptr. 148 (Wellman).)
"`Encompassed within [this] well-established fundamental right of parents to raise their children is the right to determine with whom their children should associate. [Citation.]' [Citation.]" (Punsly v. Ho (2001) 87 Cal.App.4th 1099, 1107, 105 Cal.Rptr.2d 139.) Indeed, "[d]eciding when, under what conditions, and with whom their children may associate is among the most important rights and responsibilities of parents." (Hoff v. Berg (N.D.1999) 595 N.W.2d 285, 291 (Hoff).) Thus, this "decisionmaking function lies at the core of parents' liberty interest in the care, custody, and control of their children." (Lulay v. Lulay (2000) 193 Ill.2d 455, 250 Ill.Dec. 758, 739 N.E.2d 521, 531 (Lulay); see also Troxel, supra, 530 U.S. at p. 80, 120 S.Ct. 2054 (conc. opn. of Thomas, J.) ["parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them"].)

B. Court-ordered Visitation Infringes on the Constitutional Right of Custodial Parents to Direct Their Children's Upbringing.
In several ways, court orders granting visitation rights to third parties, including grandparents, infringe on the constitutional right of custodial parents to direct their children's upbringing. As noted above, *865 both the federal and state Constitutions establish the right of custodial parents to decide with whom their children will associate. Obviously, court-ordered visitation over a custodial parent's objection infringes on that right. Moreover, California courts have long held that visitation is really just "a limited form of custody during the time the visitation rights are being exercised." (Perry v. Superior Court (1980) 108 Cal.App.3d 480, 483, 166 Cal. Rptr. 583; see also In re Marriage of Gayden (1991) 229 Cal.App.3d 1510, 1517, 280 Cal.Rptr. 862 (Gayden); Guardianship of Martha M. (1988) 204 Cal.App.3d 909, 912, 251 Cal.Rptr. 567; Wellman, supra, 104 Cal.App.3d at p. 996, 164 Cal. Rptr. 148.) Thus, a court order granting visitation rights to a third party is in essence an order transferring custody of the child from the custodial parent to the third party. In this sense, court-ordered visitation clearly constitutes a significant infringement of a custodial parent's constitutional right to the companionship, care, custody, and management of his or his children. (See Lulay, supra, 250 Ill.Dec. 758, 739 N.E.2d at p. 532 ["by allowing the state . . . to force parents to deliver their children to individuals whom the parents have decided the children should not see," statute permitting grandparents to obtain court-ordered visitation "significantly interferes with a fundamental constitutional right"].)
The visitation ordered in this case well illustrates the extent to which court-ordered visitation infringes on a custodial parent's constitutional right. As noted above, the trial court here ordered that three times a year, starting when Emily was only six years old, Karen would have to put Emily on a plane in Salt Lake City to fly to California by herself, thus transferring Emily's care and custody to Grandparents for extended periods of time. The visitation periods the court specified meant that Emily would be separated from the rest of her family in Utah during the Christmas/New Year's holiday period and parts of the summer vacation period. Moreover, the court ruled that during these periods of transferred custody, Grandparents could take Emily anywhere else in the United States to see other relatives, with the only limitation being that if they took Emily "out of [San Diego] County overnight," they had to inform Karen of Emily's whereabouts. Clearly, the court's visitation order significantly infringed on Karen's constitutional right to direct Emily's upbringing.
Court-ordered visitation also infringes on a custodial parent's constitutional right in another, more general sense. As a majority of the high court recently recognized, where, as here, third parties ask a court to override a custodial parent's decision and to order visitation, "the burden of litigating" the visitation request "can itself be `so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.' [Citation.]" (Troxel, supra, 530 U.S. at p. 75, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.), quoting id. at p. 101, 120 S.Ct. 2054 (dis. opn. of Kennedy, J.).) In response to a visitation request, custodial parents "must presumably hire attorneys, and then present evidence and defend their decision regarding the visitation before a trial court. The parents' authority over their children is necessarily diminished by this procedure." (Lulay, supra, 250 Ill.Dec. 758, 739 N.E.2d at pp. 531-532.) Court-ordered visitation also undermines the child's "`trust that the adults who are responsible for him are the arbiters of his care and control. . . ." (Gayden, supra, 229 Cal.App.3d at p. 1517, 280 Cal.Rptr. 862.) Thus, "judicially compelled visitation against the wishes of" a *866 custodial parent "can significantly affect parental authority and the strength of the family unit." (Ibid.) "This can only be characterized as a significant interference with parents' fundamental right to make decisions regarding the upbringing of their children." (Lulay, supra, 250 Ill.Dec. 758, 739 N.E.2d at p. 532.)

C. Court-ordered Visitation by a Third Party Infringes on a Custodial Parent's Constitutional Rights Regardless of the Noncustodial Parent's Support for Visitation.
In its analysis, the majority stresses the fact that Emily's father, Charles, "supported" Grandparents' visitation request. (Maj. opn., ante, at pp. 226-228, 230, 17 Cal.Rptr.3d at pp. 855-856, 858, 96 P.3d at pp. 151-152,153.) According to the majority, when a state, at the request of a third party, steps in and overrides the decision of a fit parent with sole legal and physical custody regarding visitation by that third party, the state's act of interference does not even "infringe[ ]" on the custodial parent's constitutional rights if the noncustodial parent supports the visitation request. (Ibid.)
For several reasons, I disagree with the majority's view that a noncustodial parent's support for a third party's visitation request completely negates the custodial parent's constitutional right to make parenting decisions without state interference. First, the majority fails to explain why, as either a factual or legal matter, such support has any effect on this constitutional right. As noted above, in July 1995, Charles stipulated that Karen would have "sole legal custody" and "sole physical" custody of Emily. Thus, Charles agreed that Karen would have the exclusive "right and . . . responsibility to make the decisions relating to" Emily's "health, education, and welfare" (§ 3006) and that Emily would be "under" Karen's exclusive "supervision." (§ 3007.) By doing so, Charles waived his right to have any legal say in most of the decisions regarding Emily's upbringing, including the decision as to whether she may associate with particular individuals. Given Charles's stipulation and its legal effect under California law, Charles's support for Grandparents' visitation request is legally irrelevant and does not affect the constitutional protection to which Karen, as Emily's sole legal custodian, is entitled against state interference with her parenting decisions. The majority neither explains its contrary view nor cites any supporting authority.[2]
Second, the majority's view is inconsistent with precedent, both in California and elsewhere. The decision most directly on point is perhaps In re Marriage of Howard (Iowa 2003) 661 N.W.2d 183 (Howard). There, after a child's parents divorced, the paternal grandparents filed a petition to enforce their right under Iowa statutes to visit their grandchild. (Id. at p. 186.) Their petition was opposed by the child's mother, but was supported by their son, the child's father, who had joint legal custody of the child. (Id. at pp. 185-186.) The trial court granted the petition and ordered visitation. (Id. at pp. 186-187.) The Iowa Supreme Court reversed, finding *867 that the statute on which the order was based unconstitutionally "interfere[d] with" the mother's "fundamental interest" under the Iowa Constitution in directing her child's upbringing. (Id. at p. 189.) In reaching its conclusion, the court expressly rejected the view the majority here adopts without analysis, i.e., if one parent supports a third party's visitation request, then court-ordered visitation does not infringe on the other parent's constitutional rights. More specifically, the court rejected the argument that "a lesser degree of scrutiny" is required in cases involving "a divorced family with two parental decisionmakers who have different opinions on the scope of their daughter's visitation with her grandparents." (Id. at p. 188.) This fact, the court explained, does "not alone diminish the fundamental interest of parents who make caretaking decisions" or "permit[ ] the state to make choices for an objecting parent (or parents). . . ." (Ibid.) Thus, the court held, despite the father's support for the grandparent's visitation request, the statute authorizing the visitation order "interfere[d] with" the mother's "fundamental interest" and was constitutionally permissible only if it was narrowly tailored to serve "a compelling interest." (Id. at p. 189.)
The Iowa Supreme Court's analysis in Howard echoes the analysis our own Courts of Appeal have adopted in determining whether and when the state may intervene to resolve disputes between divorced parents. In In re Marriage of Mentry (1983) 142 Cal.App.3d 260, 190 Cal.Rptr. 843 (Mentry), a trial court issued an order restraining a divorced father from involving his children in any religious activity during his visits with them. (Id. at pp. 261-262, 190 Cal.Rptr. 843.) The Court of Appeal reversed, holding in part that the order was "an unwarranted intrusion into family privacy." (Id. at p. 262, 190 Cal.Rptr. 843.) The court first noted that case law in California "reflect[s] a salutary judicial disinclination to interfere with family privacy without the evidentiary establishment of compelling need. [Citation.]" (Id. at p. 266, 190 Cal.Rptr. 843.) It then explained: "The rationale that supports judicial respect for family privacy does not lose its force upon the dissolution of marriage. . . . The concept of family privacy embodies not simply a policy of minimum state intervention but also a presumption of parental autonomy. Many of the purposes served by this presumption become more important after dissolution than they were before. One such purpose, for example, is to diminish the uncertainties and discontinuities that can afflict the parent-child relationship whenever third parties (lawyers as well as judges) episodically intrude through an ill-equipped adversarial process in which decisions are subject to reconsideration and eventual appellate review. Such uncertainties and discontinuities are of course more likely . . . after separation or dissolution than before. . . . For these reasons, among others, considerations of family privacy and parental autonomy should continue to constrain the exercise of judicial authority despite the fact that the family is no longer intact; indeed, such considerations more often than not gain force because the family is no longer intact." (Id. at pp. 267-268, 190 Cal.Rptr. 843, fns. omitted.) Thus, the court held, where the propriety of a given decision rests on "debatable value judgments," the state may not "intervene" to resolve parental disputes absent "a clear affirmative showing of harm or likely harm to the child." (Id. at p. 269, 190 Cal.Rptr. 843.)
Decisions from other states are in accord with the analysis in Howard and Mentry, including some that specifically involve statutes granting visitation rights to grandparents. For example, in Beagle *868 v. Beagle (Fla.1996) 678 So.2d 1271, 1273, the Florida Supreme Court considered the constitutionality of a Florida statute permitting a court to order visitation by grandparents where the child is living with both parents and "either or both" of them objects. The court held that even where only "one parent" objects to visitation by the grandparents, a judicial visitation order constitutes "[s]tate interference with the fundamental right" of the objecting parent under the Florida Constitution "to raise [his or her] children," and that this act of state interference is constitutionally impermissible absent a "compelling state interest."[3] (Beagle, at p. 1276.)
In Rust v. Rust (Tenn. Ct.App. 1993) 864 S.W.2d 52, 53, a Tennessee appellate court considered the constitutionality of a trial court order, issued at the request of a divorced father, prohibiting a divorced mother with sole custody of the couple's children from home-schooling the children and requiring her to enroll them in public or private school. In reversing, the appellate court held that the order impermissibly interfered with the mother's "fundamental liberty interest" under the state Constitution "to raise [her] own children as [she] see[s] fit." (Id. at p. 55.) The court reasoned that a final custody order "creates new legal relationships between the parents themselves and between each parent and the child or children. It also creates a new family unit now commonly referred to as a `single parent family,'" which "is entitled to a similar measure of constitutional protection against unwarranted governmental intrusion as is accorded to an intact, two-parent family. [Citations.] Unless the court modifies its custody order, a custodial parent should be permitted to make the significant, life-influencing decisions affecting his or her child as long as the parent remains fit to have custody." (Id. at pp. 56.) Thus, the court held, judicial orders that interfere with the decisions of custodial parents infringe on the constitutional rights of those parents notwithstanding the wishes of the noncustodial parent. (Ibid.)
As these decisions demonstrate, courts in California and elsewhere agree that when the state steps in and interferes with a parent's decision regarding his or her child, the parent's constitutional rights have been infringed on whether or not the other parent supports the state's decision. They support the conclusion that the trial court's visitation order here infringed on Karen's constitutional rights notwithstanding Charles's support for Grandparents' request. The majority's contrary conclusion is inconsistent with these decisions.
The only justification the majority gives for its conclusion is that nothing in Troxel or the California decisions Karen cites suggests that a visitation order supported by one parent infringes on the parental rights of the other parent. (Maj. opn., ante, 17 Cal.Rptr.3d at pp. 855-856, 858, 96 P.3d at *869 pp. 151-152, 153.) However, nothing in any of those decisions supports the majority's view, and the majority does not contend otherwise. Nor does anything in those decisions support the majority's view that for purposes of third party visitation, there is a constitutionally significant difference between a "sole surviving parent" and a divorced parent with sole legal custody of his or her child. (Maj. opn., ante, at pp. 854-856, 96 P.3d at pp. 151-53.) Again, the majority does not contend otherwise. Finally, the majority offers no persuasive reason for ignoring the constitutional privacy decisions of this court that Karen cites; without analysis, the majority summarily disregards those decisions merely because they involved a different factual "context." (Maj. opn., ante, at p. 857, 96 P.3d at p. 153.) In short, the majority unjustifiably ignores relevant decisions that support Karen's position while citing absolutely no positive support for its conclusion that Charles's endorsement of Grandparents' visitation request completely negates Karen's constitutional right to make parenting decisions without state interference.
I disagree with the majority's view for one additional and important reason: its implications and consequences. It is a fundamental precept that constitutional due process protections do not apply if no state action implicates or infringes upon a constitutionally protected right or interest. (See, e.g., Board of Regents v. Roth (1972) 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 [constitutional due process protections "apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property"].) In light of this precept, if, as the majority holds, court-ordered visitation under the circumstances here does not even "infringe[ ] upon" a custodial parent's constitutional rights (maj. opn., ante, 17 Cal.Rptr.3d at pp. 854-856, 858, 96 P.3d at pp. 151-153), then so long as a third party's visitation request is supported by a noncustodial parent, there is no constitutional constraint on the state's power to step in and override the custodial parent's decision. Thus, under the majority's holding, the state may, if it wants, authorize a court considering such a supported request to issue a visitation order ex parte and without providing the custodial parent either notice or a hearing. The state may also set any (or no) standard for granting such a request or impose the burden of proof on a custodial parent to show why it should be denied. Because I find the majority's conclusion as troubling as it is unprecedented, I reject it.[4] (Cf. Santosky v. Kramer (1982) 455 U.S. 745, 754, fn. 7, 102 S.Ct. 1388, 71 L.Ed.2d 599 ["that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the natural parents constitutionally adequate procedures"] (Santosky).)

*870 D. The Visitation Order Here Is Unconstitutional Absent Clear and Convincing Evidence to Overcome the Presumption that Visitation Is Not in the Child's Best Interests.
Not every state act that infringes on a fundamental constitutional right is unconstitutional. (See Carey v. Population Services International (1977) 431 U.S. 678, 686, 97 S.Ct. 2010, 52 L.Ed.2d 675 [regulation that burdens constitutional right of privacy "may be validated by a sufficiently compelling state interest"]; Citizens for Parental Rights v. San Mateo County Bd. Of Education (1975) 51 Cal.App.3d 1, 12, 124 Cal.Rptr. 68 ["not all infringements of religious beliefs are constitutionally impermissible"].) "If the state is seeking to serve a compelling interest, an interference with a constitutional right is permissible if it is narrowly tailored.' [Citation.]" (People v. Adams (1993) 19 Cal.App.4th 412, 441, 23 Cal.Rptr.2d 512.)
In constitutional terms, the interest the state seeks to serve through section 3104 is certainly compelling. "Numerous California decisions recognize that the state has a special and particularly compelling interest in protecting the health and welfare of children. [Citations.]" (American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 342, 66 Cal.Rptr.2d 210, 940 P.2d 797 (plur. opn. of George, C.J.); see also In re Marilyn H. (1993) 5 Cal.4th 295, 307, 19 Cal.Rptr.2d 544, 851 P.2d 826 ["the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect"].) Similarly, the United States Supreme Court has recognized that the state's "interest in the welfare of the child" is "urgent." (Lassiter v. Department of Social Services (1981) 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640.) Thus, the critical question here is whether section 3104 is narrowly tailored to serve the state's compelling interest in the welfare of children.
In answering this question, it is necessary first to consider how section 3104 operates. The statute permits a court, on petition of a grandparent, to grant "reasonable visitation rights to the grandparent." (§ 3104, subd. (a).) It places two general limitations on a court's power to grant such rights. First, a court must "[b]alance the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority." (§ 3104, subd. (a)(2).) Second, a court may not award visitation rights unless it "[f]inds that there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child." (§ 3104, subd. (a)(1).) On the facts of this case, the statute places one additional limitation on a court's power to grant visitation; because Karen has sole legal and physical custody and "objects to visitation," the court must apply "a rebuttable presumption affecting the burden of proof that the visitation . . . is not in the best interest of [the] child . . . ." (§ 3104, subd. (f).)
The majority holds that the rebuttable presumption in section 3104, subdivision (f), preserves the statute's constitutionality as it applies in this case. In this regard, the majority summarily asserts that this presumption "prevent[s] the situation that arose in Troxel in which the court-ordered visitation over the objection of the child's sole surviving fit parent based upon a finding that such visitation was in the child's best interest." (Maj. opn., ante, 17 Cal. Rptr.3d at p. 855, 96 P.3d at p. 151.)
Given the legal effect of the presumption under California law, the majority's assertion is incorrect unless we require petitioning grandparents to rebut the presumption with clear and convincing evidence. Under *871 our Evidence Code, "[t]he effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid.Code, § 606.) Thus, in this case, the rebuttable presumption under section 3104, subdivision (f), does nothing more than put the burden on Grandparents, as the parties against whom the presumption operates, to prove that denying visitation is not in Emily's best interest.
In light of Evidence Code section 606, the rebuttable presumption under Family Code section 3104, subdivision (f), though sounding formidable, really does very little if it may be rebutted by a simple preponderance of the evidence. The structure of section 3104  which permits a visitation award only on a grandparent's petition and a court's finding that visitation is in the child's best interest  already suggests that the burden of proof regarding the child's best interests should be on the grandparent, as the petitioning party. The rebuttable presumption seems merely to confirm this fact. As explained in the official comment to Evidence Code section 606 by the Assembly Committee on Judiciary, a presumption affecting the burden of proof has "no effect" where "the party against whom the presumption operates already has the same burden of proof as to the nonexistence of the presumed fact." (Assem. Judiciary Com. com., 29B Pt. 2 West's Ann. Evid.Code (1995 ed.) Foll. § 606, p. 65.) The official comment to Evidence Code section 606 also explains that "[i]n the ordinary case, the party against whom" such a presumption operates merely has "the burden of proving the nonexistence of the presumed fact by a preponderance of the evidence." (Assem. Judiciary Com. com., 29B Pt. 2 West's Ann. Evid.Code, supra, foll. § 606, p. 64.) Consistent with this comment, Evidence Code section 115 provides that "[e]xcept as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." If the preponderance standard applies here, then the rebuttable presumption under Family Code section 3104, subdivision (f), simply puts the burden on a petitioning grandparent to convince a judge that visitation over the custodial parent's objection is "more likely than not" in the child's best interest. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 845, 851, 107 Cal.Rptr.2d 841, 24 P.3d 493.) So construed, the presumption does not, as the majority asserts, "prevent the situation that arose in Troxel in which the court-ordered visitation over the objection of the child's sole surviving fit parent based upon a finding that such visitation was in the child's best interest." (Maj. opn., ante, 17 Cal.Rptr.3d at p. 855, 96 P.3d at p. 151.) On the contrary, so construed, the presumption expressly contemplates and provides for that very situation. It also gives virtually no special weight to the custodial parent's decision.
Contrary to the majority's assertion, the high court in Troxel did not declare otherwise. (Maj. opn., ante, 17 Cal.Rptr.3d at p. 855, 96 P.3d at p. 151.) The majority asserts that by citing section 3104 "with approval," the "high court" in Troxel "recognized" that section 3104 "gives `special weight' to the parents' decision." (Maj. opn., ante, at pp. 855, 96 P.3d at pp. 150-156.) However, the citation to section 3104 on which the majority relies appeared in Justice O'Connor's plurality opinion and was not endorsed by a majority of the court. (Troxel, supra, 530 U.S. at p. 70, 120 S.Ct. 2054 (plur. opn. by O'Connor, J.).) Moreover, the plurality in Troxel did not cite section 3104 "with approval" (maj. opn., ante, at p. 855, 96 P.3d at p. 151); it merely included a "cf." citation to section 3104 after explaining that a Washington court, in granting visitation, had "failed to *872 provide any protection for [the parent's] fundamental constitutional right to make decisions concerning the rearing of her own daughters." (Troxel, supra, 530 U.S. at p. 70, 120 S.Ct. 2054 (plur. opn. by O'Connor, J.), italics added.) In context, this citation suggests that in the view of the Troxel plurality, unlike the Washington court  which failed to provide any protection for a parent's fundamental right  section 3104 provides at least some protection. However, the Troxel plurality did not, as the majority asserts, conclude or even suggest that the protection section 3104 provides is constitutionally adequate. On the contrary, the Troxel plurality expressly declined to specify what minimum level of protection is constitutionally required, explaining: "We do not, and need not, define today the precise scope of the parental due process right in the visitation context. . . . [T]he constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied . . . and the constitutional protections in this area are best `elaborated with care.' [Citation.]" (Troxel, supra, 530 U.S. at p. 73, 120 S.Ct. 2054.) Thus, contrary to the majority's assertion, the Troxel plurality's unadorned citation of section 3104 does not establish the statute's constitutionality.
Nevertheless, we may "construe" the statute to preserve its constitutionality "by requiring clear and convincing evidence" to rebut the presumption that visitation by a petitioning grandparent over a custodial parent's objection is not in the child's best interest.[5] (Conservatorship of Wendland (2001) 26 Cal.4th 519, 543, 110 Cal.Rptr.2d 412, 28 P.3d 151 (Wendland).) Section 3104 is silent regarding the standard of proof, so construing it to require clear and convincing evidence "does not entail a deviation from the language of the statute. . . ." (Wendland, supra, 26 Cal.4th at p. 543, 110 Cal.Rptr.2d 412, 28 P.3d 151.) As noted above, Evidence Code section 115 provides that the preponderance standard applies "[e]xcept as otherwise provided by law." "`Law,' as referenced in [this section], includes `constitutional, statutory, and decisional law.' (Evid.Code, § 160.)" (Weiner v. Fleischman (1991) 54 Cal.3d 476, 483, 286 Cal.Rptr. 40, 816 P.2d 892 (Weiner).) Taken together, these sections establish that the preponderance standard applies "`unless a heavier or lesser burden of proof is specifically required . . . by constitutional, statutory, or decisional law.'" (People v. Burnick (1975) 14 Cal.3d 306, 314, 121 Cal.Rptr. 488, 535 P.2d 352, italics omitted.) Thus, it is both necessary and appropriate for us to "determine whether constitutional, statutory or decisional law (i.e., case law) requires a burden of proof higher than preponderance of the evidence to" overcome the presumption under section 3104, subdivision (f). (Weiner, supra, 54 Cal.3d at p. 483, 286 Cal.Rptr. 40, 816 P.2d 892; see also Santosky, supra, 455 U.S. at pp. 755-756, 102 S.Ct. 1388 [determining "degree of proof required . . . `is the kind of question which has traditionally been left to the judiciary'"].) We must ensure that the applicable standard of proof "satisfies `the constitutional minimum of "fundamental fairness."' *873 [Citations.]"[6] (Santsoky, supra, 455 U.S. at p. 756, fn. 8, 102 S.Ct. 1388.)
"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to `instruct the factfinder concerning the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.' [Citation.] The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." (Addington v. Texas (1979) 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (Addington); see also In re Angelia P. (1981) 28 Cal.3d 908, 919, 171 Cal.Rptr. 637, 623 P.2d 198 [quoting Addington].) As the high court has explained, where "society has a minimal concern with the outcome" of a case  such as with "the typical civil case involving a monetary dispute between private parties"  the "preponderance" standard applies. (Addington, supra, 441 U.S. at p. 423, 99 S.Ct. 1804.) Application of this relatively low standard reflects society's "minimal concern" in these cases by allocating the risk of error "in roughly equal fashion." (Ibid.; see also Weiner, supra, 54 Cal.3d at p. 488, 286 Cal.Rptr. 40, 816 P.2d 892.)
On the other hand, in civil cases where "[t]he interests at stake . . . are . . . more substantial than mere loss of money," the "clear and convincing evidence" standard applies. (Addington, supra, 441 U.S. at pp. 424-425, 99 S.Ct. 1804.) Because society has a greater concern with the outcome of these cases, we apply a standard of proof "requiring that the evidence be `so clear as to leave no substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind.' [Citation.]" (In re Angelia P., supra, 28 Cal.3d at p. 919, 171 Cal.Rptr. 637, 623 P.2d 198.) We have held that "[p]roof by clear and convincing evidence is required `where particularly important individual interests or rights are at stake,' such as the termination of parental rights, involuntary commitment, and deportation. [Citation.]" (Weiner, supra, 54 Cal.3d at p. 487, 286 Cal.Rptr. 40, 816 P.2d 892; see also Wendland, supra, 26 Cal.4th at pp. 546-547, 110 Cal.Rptr.2d 412, 28 P.3d 151.) Similarly, the high court "has applied [this] standard in cases implicating fundamental liberty interests protected by the Fourteenth Amendment, such as proceedings to terminate parental rights [citation]. . . ." (Wendland, supra, 26 Cal.4th at pp. 546-547, 110 Cal.Rptr.2d 412, 28 P.3d 151; see also Santosky, supra, 455 U.S. at p. 756, 102 S.Ct. 1388 ["[t]his Court has mandated" the clear and convincing standard "when the individual interests at stake in a state proceeding are both `particularly important' and `more substantial than mere loss of money'"]; Addington, supra, 441 U.S. at p. 424, 99 S.Ct. 1804 ["this Court has used the `clear, unequivocal and convincing' standard of proof to protect particularly important individual interests in various civil cases"].) As the high court has explained, "adopting a `standard of proof is more than an empty semantic exercise.' [Citation.] In cases involving individual rights, whether criminal or civil, `[the] standard of proof [at a minimum] reflects the value society places on individual liberty.' [Citation.]" (Id. at p. 425, 99 S.Ct. 1804.)
Applying these principles, I conclude, as did the Court of Appeal, that the "clear and convincing evidence" standard must be applied in determining whether a court, on *874 the state's behalf, may grant visitation rights to grandparents over the objection of a child's custodial parent. As explained above, a parent's constitutionally protected liberty interest in directing his or her child's upbringing is both fundamental and compelling; it is possibly the oldest fundamental liberty interest the high court has recognized and is ranked among the most basic of civil rights. (Troxel, supra, 530 U.S. at p. 65, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.); In re B.G., supra, 11 Cal.3d at p. 688, 114 Cal.Rptr. 444, 523 P.2d 244.) As also explained above, the right of parents to decide with whom their children may associate lies at the core of this fundamental constitutional liberty interest. (Troxel, supra, 530 U.S. at p. 80, 120 S.Ct. 2054 (conc. opn. of Thomas. J.); Punsly v. Ho, supra, 87 Cal.App.4th at p. 1107, 105 Cal.Rptr.2d 139; Hoff, supra, 595 N.W.2d at p. 291; Lulay, supra, 250 Ill. Dec. 758, 739 N.E.2d at p. 531.) Of course, as already noted, the state has a compelling interest in the child's welfare. Moreover, questions regarding visitation by third parties also implicate the child's interests. (Troxel, supra, 530 U.S. at pp. 86, 88, 120 S.Ct. 2054 (dis. opn. of Stevens, J.).) However, as the plurality in Troxel recently explained, "there is a presumption that fit parents act in the best interests of their children. . . . Accordingly, so long as a parent [is fit], there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. [Citation.]" (Id. at p. 68, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).) Thus, until proven otherwise, "the child and his [or her] parents share a vital interest in preventing erroneous" state interference in their relationship, and their interests "coincide to favor use of error-reducing procedures." (Sanosky, supra, 455 U.S. at pp. 760-761, 102 S.Ct. 1388.)
Moreover, the nature of the factual determination a court must make under section 3104  whether visitation is in the child's best interests  heightens the risk of error. The high court has observed that the "`best interests'" standard is "vague" and that "judges . . . utilizing [it] . . . may find it difficult . . . to avoid decisions resting on subjective values." (Smith v. Organization of Foster Families (1977) 431 U.S. 816, 835, fn. 36, 97 S.Ct. 2094, 53 L.Ed.2d 14; see also Troxel, supra, 530 U.S. at p. 101, 120 S.Ct. 2054 (dis. opn. of Kennedy, J.) ["best interests" test "has at times been criticized as indeterminate, leading to unpredictable results"].) In holding that the federal due process clause requires application of a clear and convincing evidence test in parental neglect proceedings, the high court in Santosky also explained that because this "imprecise substantive standard[] . . . leave[s] determinations unusually open to the subjective values of the judge," it "magnif[ies] the risk of erroneous factfinding." (Santosky, supra, 455 U.S. at p. 762, 102 S.Ct. 1388, italics added.) The court in Santosky went on to explain that "[c]oupled with a `fair preponderance of the evidence' standard," the best interest test "create[s] a significant prospect of erro[r]." (Id. at p. 764, 102 S.Ct. 1388.) Given the weight of the parent's interest, the high court concluded in Santosky that only the "`clear and convincing evidence' standard of proof . . . adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." (Id. at p. 769, 102 S.Ct. 1388.) "`The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.' [Citation.]" (Id. at p. 768, 102 S.Ct. 1388.)
*875 In light of the weight of the parent's interest at stake here, I similarly conclude that the "clear and convincing evidence" standard of proof is required with regard to section 3104. As the Court of Appeal held, this standard "is necessary to assure [that] adequate deference is accorded to a fit parent's decisions about raising his or her children." A lower standard of proof creates too great a risk of "having a court [merely] substitute its own views" regarding the child's best interests "for those of a fit parent." And, as the plurality explained in Troxel, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made." (Troxel, supra, 530 U.S. at pp. 72-73, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).) Thus, I conclude that section 3104 is constitutional only if we construe it to require a finding that visitation over the objection of a custodial parent is not in the child's best interest, absent clear and convincing evidence to the contrary, i.e., evidence "`"sufficiently strong to command the unhesitating assent of every reasonable mind."'[Citation.]"[7] (In re Angelia P., supra, 28 Cal.3d at p. 919, 171 Cal. Rptr. 637, 623 P.2d 198.)

Conclusion
I am not insensitive to the tremendous hurt most grandparents feel when they are cut off from their grandchildren. Moreover, like most people, I believe that grandparents generally should be an integral part of a child's upbringing and that most of the time, they have an extremely positive impact on the child. Thus, "[i]n an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren." (Troxel, supra, 530 U.S. at p. 70, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).) Unfortunately, as we all know, "our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial . . . is for the parent to make in the first instance." (Ibid.) Family privacy is grounded on the right of parents to rear their children without unwarranted state interference. Therefore, the issue here is not whether interaction between grandparents and their grandchildren is desirable, but whether, and under what circumstances, the state may constitutionally interfere *876 with the rights of a fit custodial parent by ordering visitation over the parent's objection. Based on the governing precedent, I conclude that court-ordered visitation infringes on a custodial parent's fundamental right to direct his or her child's upbringing, and that this state infringement on a parent's fundamental right is unconstitutional absent clear and convincing evidence to rebut the presumption under section 3104, subdivision (f), that such visitation is not in the child's best interests. I dissent to the extent the majority holds otherwise.
Concurring and Dissenting Opinion by BROWN, J.
I agree with the majority that Family Code[1] section 3104 controls this case, that the section is facially constitutional, and that the matter should be remanded for the trial court to reconsider its July 2000 visitation order in light of section 3104, subdivision (f). I disagree with the majority that an order imposing grandparent visitation would never infringe on a sole custodial parent's constitutional rights if the child's noncustodial parent, who in this case had no visitation rights, had not seen his five-year-old daughter in five years, and has since had his own parental rights terminated, supported such visitation. Moreover, I agree with Justice Baxter that any conclusion regarding the mother's as-applied challenge to section 3104 is premature unless and until the statute is actually applied on remand. (Conc. and dis. opn. by Baxter, J., ante, 17 Cal.Rptr.3d at pp. 858-860, 96 P.3d at pp. 151-154.)
In addition, "to minimize the possibility of its unconstitutional application," I agree with Justice Chin to the extent he concludes section 3104, subdivision (f), should be read to require clear and convincing evidence to rebut the presumption that grandparent visitation is not in the child's best interest if the sole custodial parent objects. (Conservatorship of Wendland (2001) 26 Cal.4th 519, 543, 110 Cal.Rptr.2d 412, 28 P.3d 151.) Indeed, absent such a standard of proof, parents would encounter not only unwarranted judicial intrusion into their private lives, but would also incur significant costs in seemingly unending litigation that would undermine their ability to care for the very children the statute is presumably intended to protect.
Nevertheless, it is also critical to acknowledge that "[c]ases like this do not present a bipolar struggle between the parents and the State over who has final authority to determine what is in a child's best interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies-the child." (Troxel v. Granville (2000) 530 U.S. 57, 86, 120 S.Ct. 2054, 147 L.Ed.2d 49 (dis. opn. of Stevens, J.) (Troxel).) Indeed, under the statutory scheme in question, the Legislature expressly requires the trial court to "[b]alance[ ] the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority." (§ 3104, subd. (a)(2).) Guided judicial discretion regarding this factor "protect[s] children against the arbitrary exercise of parental authority that is not in fact motivated by an interest in the welfare of the child." (Troxel, at p. 89, 120 S.Ct. 2054 (dis. opn. of Stevens, J.).)
Suppose grandparents have for years devoted themselves to nurturing and raising a grandchild, acting essentially as de facto parents under circumstances in which their own child, the natural parent, has personal difficulties rendering her incapable of caring for her own child. Such grandparents fill an incalculable void in the child's life, and have "developed a relationship *877 with [the] child which is not necessarily subject to absolute parental veto." (Troxel, supra, 530 U.S. at p. 98, 120 S.Ct. 2054 (dis. opn. of Kennedy, J.).) If the natural parent at some point begins to adequately care for her own child, and arbitrarily terminates contact between the grandparents and the child, it would seem the grandparents could adduce clear and convincing evidence that the child's best interests are not being served.
In a perfect world, family conflicts would not deteriorate into public brawls; courts would not be required to intervene. Parents would always act rationally and in the best interests of their offspring, and children would never be used as pawns or treated as chattel. But we do not live in a perfect world. When courts are forced to intrude, we must rely on burdens of proof and judicial balancing acts to protect a significant sphere of parental authority and preserve as much flexibility as possible. This is not the best of all possible worlds, it is just the best we can do.
Here, Emily is now nearly 10, and capable of voicing her own preferences. Her mother is a fit parent who did not oppose visitation, but who reasonably objected to the expansive order regarding her then five-year-old daughter. (Maj. opn., ante, 17 Cal.Rptr.3d at pp. 848-849, 96 P.3d at p. 146.) And at this point the father's parental rights have been terminated, and hence his views regarding grandparent visitation are not relevant. The trial court may of course consider all of these circumstances on remand in determining whether any visitation order is appropriate at this point under section 3104, and if so, the scope of that order. (See maj. opn., ante, at p. 858, 96 P.3d at p. 154.)
NOTES
[*] Werdegar, J., did not participate therein. Baxter and Chin, JJ., dissented.
[1] Pending these proceedings, the Court of Appeal ordered that Emily be accompanied by one of the paternal grandparents during any travel.
[2] All further statutory references are to the Family Code, unless otherwise noted.

Section 3102, subdivision (a), provides, in pertinent part: "If either parent of an unemancipated minor child is deceased, the children, siblings, parents, and grandparents of the deceased parent may be granted reasonable visitation with the child during the child's minority upon a finding that the visitation would be in the best interest of the minor child." Subdivision (c) states that the section "does not apply if the child has been adopted by a person other than a stepparent or grandparent of the child" and that "[a]ny visitation rights granted pursuant to this section automatically terminate if the child is adopted" by such a person.
[3] Section 3103 provides, in pertinent part: "(a) Notwithstanding any other provision of law, in a proceeding described in Section 3021, the court may grant reasonable visitation to a grandparent of a minor child of a party to the proceeding if the court determines that visitation by the grandparent is in the best interest of the child. [¶] . . . [¶] (d) There is a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the child's parents agree that the grandparent should not be granted visitation rights."
[4] Section 3104 provides, in pertinent part: "(a) On petition to the court by a grandparent of a minor child, the court may grant reasonable visitation rights to the grandparent if the court does both of the following: [¶] (1) Finds that there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child. [¶] (2) Balances the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority. [¶] (b) A petition for visitation under this section may not be filed while the natural or adoptive parents are married, unless one or more of the following circumstances exist: [¶] (1) The parents are currently living separately and apart on a permanent or indefinite basis. [¶] (2) One of the parents has been absent for more than one month without the other spouse knowing the whereabouts of the absent spouse. [¶] (3) One of the parents joins in the petition with the grandparents. [¶] (4) The child is not residing with either parent. [¶] . . . [¶] (e) There is a rebuttable presumption that the visitation of a grandparent is not in the best interest of a minor child if the natural or adoptive parents agree that the grandparents should not be granted visitation rights. [¶] (f) There is a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the parent who has been awarded sole legal and physical custody of the child in another proceeding or with whom the child resides if there is currently no operative custody order objects to visitation by the grandparent."
[5] In addition, section 3100 provides that in making an order for joint custody of a minor child, "[i]n the discretion of the court, reasonable visitation rights may be granted to any other person having an interest in the welfare of the child." As noted above, the present case does not involve an order for joint custody.
[6] As noted above, the superior court has since terminated the father's parental rights, but this circumstance does not affect our analysis because it occurred after the superior court issued the order here at issue.
[7] Section 3021 provides: "This part applies in any of the following: [¶] (a) A proceeding for dissolution of marriage. [¶] (b) A proceeding for nullity of marriage. [¶] (c) A proceeding for legal separation of the parties. [¶] (d) An action for exclusive custody pursuant to Section 3120.[¶] (e) A proceeding to determine physical or legal custody or for visitation in a proceeding pursuant to the Domestic Violence Prevention Act . . . . [¶] . . . [¶] (f) A proceeding to determine physical or legal custody or visitation in an action pursuant to the Uniform Parentage Act . . . . [¶] (g) A proceeding to determine physical or legal custody or visitation in an action brought by the district attorney pursuant to Section 17404."
[8] Justice Baxter's concurring and dissenting opinion asserts that although it is proper for us to decide that the statute is constitutional on its face, we can and should avoid deciding whether the statute is constitutional as applied because the matter must be remanded for the superior court to apply the rebuttal presumption in section 3104, subdivision (f). We do not agree that it is unnecessary to reach the constitutional issue. If we agreed with the mother that section 3104 is unconstitutional as applied to a parent such as herself who has been granted sole custody of the child, there would be no need to remand the matter.
[1] Indeed, as stated in their brief, the grandparents "do not dispute that the Mother has a legally protected privacy right in regards to the parenting of her child[,] which would include control over relinquishment of her child to a third party for visitation."
[2] As we noted in Kasler v. Lockyer (2000) 23 Cal.4th 472, 502, 97 Cal.Rptr.2d 334, 2 P.3d 581, "[t]he standard governing a facial challenge to the constitutional validity of a statute has been the subject of controversy within this court." (Compare American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at p. 343, 66 Cal.Rptr.2d 210, 940 P.2d 797 with id. at p. 412, 66 Cal.Rptr.2d 210, 940 P.2d 797 (dis. opn. of Baxter, J.) and id. at p. 421, 66 Cal.Rptr.2d 210, 940 P.2d 797 (dis. opn. of Brown, J.).) Here, as in Kasler, we need not resolve the controversy because the mother has not made the requisite showing even under the standard most favorable to her position. (Kasler, supra, 23 Cal.4th at p. 502, 97 Cal.Rptr.2d 334, 2 P.3d 581.)
[1] Except as otherwise indicated, all further statutory references are to the Family Code.
[2] Ironically, according to the majority, although Charles himself has no right to visit Emily, his support for Grandparents' visitation request completely negates Karen's constitutional rights and strips her of any constitutional protection against state interference with her parenting decisions as Emily's sole custodian. Moreover, the trial court's refusal to grant Charles even supervised visitation undermines the majority's factually unsupported assertion that he is a "fit" parent. (Maj. opn., ante, 17 Cal.Rptr.3d at p. 855, 96 P.3d at p. 151.)
[3] The court limited its decision to situations "in which a child is living with both natural parents." (Beagle. v. Beagle, supra, 678 So.2d at p. 1272.) However, the court later disavowed this limitation and extended its analysis to situations where the child's parents never married and never lived together. (Saul v. Brunetti (Fla.2000) 753 So.2d 26, 28-29.) It also later applied this analysis to hold that an order transferring custody to grandparents based merely on a child's best interests violates the constitutional rights of a divorced custodial parent, even if the noncustodial parent supports the grandparents' request. (Richardson v. Richardson (Fla.2000) 766 So.2d 1036, 1038.) More recently, the court noted that it "has consistently held all statutes that have attempted to compel visitation or custody with a grandparent based solely on the best interest of the child standard, without the required showing of harm to the child, to be unconstitutional." (Sullivan v. Sapp. (Fla.2004) 866 So.2d 28, 37.)
[4] I note that the majority's conclusion in this regard renders its earlier discussion of Troxel completely unnecessary. The plurality in Troxel concluded that the visitation order there at issue "infringe[d] on" the parent's "fundamental parental right" and that the infringement violated the federal "Due Process Clause" because the court issuing the order "accorded no deference," "presumption of validity," or "weight" to the parent's decision. (Troxel, supra, 530 U.S. at p. 67, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.).) In other words, the federal due process clause was applicable  and required that some deference be given the parent's decision  only because the order in Troxel infringed on the parent's constitutional right. Under the majority's conclusion that the order here does not infringe on Karen's constitutional rights, both the federal due process clause and Troxel are irrelevant and there is no constitutional limitation on the state's ability to step in and override Karen's decision regarding third party visitation.
[5] Adopting this standard of proof in all visitation cases is not inconsistent with the Troxel plurality's refusal to make broad pronouncements about a statute's facial constitutionality. The high court "never has approved case-by-case determination of the proper standard of proof for a given proceeding." (Santosky, supra, 455 U.S. at p. 757, 102 S.Ct. 1388.) As the court has explained, because "the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance." (Ibid.)
[6] The Court of Appeal recognized this responsibility and construed section 3104 to require clear and convincing evidence. Despite this holding and the fact that the parties and amici curiae have briefed the issue in this court, the majority does not even mention it.
[7] Karen asserts, and the Court of Appeal held, that section 3104 is unconstitutional unless construed to require a showing of actual or potential harm. In most cases, the elevated standard of proof I would impose  clear and convincing evidence to rebut the presumption that visitation over the custodial parent's objection is not in the child's best interest  will require grandparents seeking visitation to show that denial of visitation would result in some kind of harm or potential harm to the child. Moreover, as previously noted, in addition to a finding regarding the child's best interest, section 3104 prohibits court-ordered visitation unless "there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond" between them, and the court considers "the right of the parents to exercise their parental authority." (§ 3104, subd. (a)(1), (2).) Given these requirements, I am not prepared to say that section 3104 is facially unconstitutional unless construed to require a showing of harm or potential harm. (See Troxel, supra, 530 U.S. at p. 73, 120 S.Ct. 2054 (plur. opn. of O'Connor, J.) [declining to consider "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm"]; id. at pp. 85-86, 120 S.Ct. 2054 (dis. opn. of Stevens, J.) [rejecting view that showing of actual or potential harm is required]; id. at p. 94, 120 S.Ct. 2054 (dis. opn. of Kennedy, J.) [rejecting view that showing of actual or potential harm is required in every case].) Of course, the statute's application in any particular case may be unconstitutional. Whether that is so here cannot be determined until after the trial court has had an opportunity on remand to apply the correct standard of proof.
[1] All further statutory references are to this code.