Filed 4/25/25  In re Jason N. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re JASON N., a Person Coming Under the Juvenile Court Law. | B334063 (Los Angeles County Super. Ct. No. 22CCJP00327) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. AMANDA K., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lucia J. Murillo, Juvenile Court Referee. Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Amanda K. (mother) appeals from an order terminating jurisdiction and granting Jason N. (father) sole legal custody of the minor Jason N. (born November 2020).[1]  We find no abuse of discretion and affirm the order.

**COMBINED FACTUAL AND PROCEDURAL HISTORY**

The following factual and procedural history, through the heading "Adjudication and disposition," is taken from our previous nonpublished opinion in *In re Jason N.* (July 19, 2023, B320970):

On January 23, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a call on the hotline alleging [mother's] children were in an unsafe situation, living in a tent in a homeless encampment on a median on a busy street in Venice, California.[2]  A service provider tried to arrange services for [mother] and the children. Mother refused assistance, including food and motel vouchers, and reacted aggressively towards the outreach provider, causing the service worker concern about the children sleeping in a tent in the cold weather. The children appeared dirty and malnourished.  Mother was

---

[1]     Father is not a party to this appeal.

[2]     Jason's half sibling Isabella (born April 2014) is not a subject of this appeal.  Jason and Isabella collectively will be referred to as the children.

2

observed to have left the children outside the tent, leaving them unsupervised. Two other people in the camp reported that mother left the two children unattended "all the time."

In a second call to the DCFS hotline, the caller provided more information, including that mother and the children were from New York and recently arrived in California. Mother claimed to have left New York because she was not getting along with maternal grandmother (MGM) and due to domestic violence with father. Mother stated there was a protective order in place in New York.

A DCFS social worker made contact with mother at the encampment on January 23, 2022. There were approximately 20 tents on a median with lanes of traffic on either side. Mother insisted she was not homeless and that she had friends and family in the area, but could not provide any contact information. Mother became agitated and belligerent when the accompanying Los Angeles Police Department officer pointed out that Isabella was barefoot in the cold weather.

Mother claimed to be having issues with father, including him being mentally abusive and a drug dealer. She said there was a restraining order against him and an upcoming custody hearing in New York. Mother admitted she had been diagnosed with "Bi-Polar Schizo affected" but provided varying answers to whether she was taking medication. Mother admitted using marijuana but was unclear when she had last used the drug.

Jason was in a wet, dirty onesie without a diaper asleep in a stroller. His arms and legs were streaked with dirt and covered with sand. Isabella was also very dirty and unkempt and could not tell the social worker when she last had a bath. Isabella confirmed mother would leave her alone in the tent in charge of

the baby.  Isabella reported Jason's "daddy" was a bad man and who used drugs.

Mother stated father raped her in New York.  Though she was uncertain he was Jason's father, she was hesitant to ask for a paternity test as she believed father knew people who could manipulate the results of such a test.  Mother reported father was a drug addict and dealer and was "organized gang stalking" her.  Mother added there had been involvement with child protective services (CPS) in New York but did not provide specifics.  Mother admitted having been addicted to oxycodone following a car accident in the past.  She completed a 30-day rehabilitation program, following an eight-day hospitalization, and occasionally used marijuana and alcohol.

The officers transported mother and the children to the police station, expressing concern about the children being in the encampment that was very dangerous.  When mother was informed the children would be detained, she became angry and telephoned MGM, yelling that MGM had to come to California to get the kids.

The social worker spoke with MGM, who informed her that mother relocated to California as planned, and there was trouble with father, who had visitation.  MGM confirmed mother had a history of mental health issues and was previously addicted to oxycodone, due to the fault of mother's doctors.  MGM was uncertain if there was a CPS history in New York.

4

**Petition and detention**

On January 25, 2022, DCFS filed a Welfare and Institutions Code section 300[3] petition on behalf of the children, containing allegations of mother's neglect, failure to supervise the children and mental health issues. A first amended section 300 petition was later filed, which added counts regarding father's substance abuse and mother's failure to protect the children. The first amended petition alleged father had a history of substance abuse including Xanax and cocaine and was a current user of oxycodone, marijuana and cocaine, rendering him unable to provide regular care for the children. The petition alleged father's substance abuse endangered the children's physical health and safety and created a detrimental home environment, placing the children at risk of serious physical harm. On May 11, 2022, the juvenile court sustained this allegation.

In a last minute information for the court filed on January 28, 2022, DCFS reported a conversation between a local social worker and a Sullivan County New York CPS social worker, Jenesis Matos, on January 26, 2022. Matos reported the family had an open referral in New York but no court filing. There was a current family law proceeding pending, and father had monitored visitation with the children. Mother had a history of mental health issues, psychiatric hospitalizations, prescription drug abuse, and leaving the children unsupervised. Mother once told the authorities after leaving the children home alone that the pit bull dogs would guard them. Mother had previously lost custody of Isabella due to mental health issues and was not

---

[3]    All further [undesignated] statutory references are to the Welfare and Institutions Code.

medication compliant. Father had a history of using and dealing drugs, but was attending a program and doing well. Father appeared to be genuinely trying to care for the children.

A second last minute information for the court filed on January 28, 2022, indicated father had contacted DCFS on January 25, 2022, and acknowledged having monitored visits twice per week. Father stated mother took the children out of New York without his permission. Mother had been leaving the children with him for days at a time despite her request for a restraining order. Father claimed mother's allegations in the restraining order were untrue. He denied being part of a gang or dealing drugs. Father confirmed mother's mental illness, recent hospitalizations and prior loss of custody of Isabella.

Father reported mother had picked up the children from his home on January 8, 2022, and was screaming in the streets that father was a drug dealer. Afterwards, mother got in a serious car accident with the children in the car. Mother's driver's license was suspended because she did not have insurance. Mother then went to a friend's home and rented a U-Haul. Father believed mother then left for California. Father had been looking for the children for two weeks before calling DCFS.

At the January 28, 2022 hearing, the juvenile court acknowledged possible jurisdictional issues under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.) and indicated it would contact the court in New York. The court found a prima facie showing had been made and ordered the children detained in foster care. It also found father to be the presumed father of Jason.

**Addendum report**

An addendum report was filed on February 16, 2022, regarding another conversation with CPS social worker Matos, who stated there were concerns with father due to his substance abuse. The family law judge ordered father to submit to a hair follicle test, and father subsequently shaved his head. The displeased judge considered it a positive test. The judge declined to grant father custody and ordered his visits be monitored.

At the most recent custody hearing, father was enrolled at an outpatient substance abuse program and had last tested positive on a drug test in November 2021. Matos did not know for which drug. Father told Matos the positive test was for "benzos," but Matos was unsure because she could not access the records. Father also disclosed that he used to sell drugs. Mother attended the same drug program but was terminated due to noncompliance. Mother had been in touch with Matos after the children were detained in California and stated she was not planning on returning to New York.

Matos expressed belief that father could care for the children with support in place. [Paternal grandmother (PGM)] was a support for father but was employed. When the DCFS social worker informed Matos that father disclosed he had a prescription for oxycodone, Matos responded that she had not been informed of this and reiterated, "substance abuse has always been a concern."

DCFS interviewed father by telephone a second time on February 15, 2022. Father had a medical marijuana card and disclosed use of marijuana one or twice a week for PTSD, anxiety, and pain in his knees, hands, back, and disc. Father claimed the pain was due to physical work. He admitted a criminal history,

7

which included a 2013 possession of cocaine with intent to sell. He completed a treatment program and a five-year probation. Father was also arrested in 2018 when he was in a car with mother that was pulled over due to a warrant for mother concerning car theft. Father stated he loved mother and "took the charge" for the marijuana found in the car.

Other than marijuana, father admitted he was "caught up with Xanax" when he was younger and still attended a support group. Father stated he was currently attending a drug program because of family court.

Father denied being verbally abusive or violent with mother. He admitted there was a protective order allowing him supervised visitation, but claimed mother "didn't care unless I did something she didn't like." Father had no contact with mother and did not seek contact; he wanted to have the children placed with him in New York. Father said his brother and sister-in-law were also willing to care for the children.

Father acknowledged if he were to drug test that day he would test positive for marijuana and oxycodone, which had been prescribed for sleep, though he was tapering off oxycodone on a "step-down" method. He offered to provide medical records if needed. Father was in a treatment program he had started the previous August or September, pursuant to an order by the family law court, and was tested for drugs by a weekly mouth swab.

Father later provided copies of his oxycodone prescription and medical marijuana card.

The children remained placed in a foster home.

The scheduled February 24, 2022 hearing was continued for the UCCJEA issue to be addressed.

**Jurisdiction/disposition report and additional reports**

The March 15, 2022 jurisdiction/disposition report included additional interviews with mother and extended family.

Mother continued to question father's paternity, did not want the children to return to New York, and did not want Isabella to have telephone contact with father as he was not her biological father. She maintained father was abusive and a drug dealer.

Maternal aunt, Ashley H., who lived in New York, expressed concern about the children being placed with father and described the paternal family as unsafe. She wished to have the children placed with her.

PGM was interviewed. She too wanted the children placed with her. She confirmed father lived with her intermittently and claimed mother made false allegations against her.

In a March 15, 2022 addendum report, DCFS provided a February 28, 2022 e-mail from father's case manager at his drug treatment program reflecting that father had been enrolled in the treatment program since September 16, 2021; father had prescriptions for oxycodone and marijuana; he tested positive for cocaine on January 27, 2022, and had otherwise tested negative for that drug; father consistently tested positive for marijuana, opiates, oxycodone, noroxycodone, and oxymorphone; and father was compliant with treatment and focused on regaining custody of his son.

Mother reiterated father was abusive. She stated she had entered the same treatment program as father, but he was "harassing" and "abusive" towards her and made false allegations against her. Mother ended their relationship in July or

9

December 2021 because it was toxic. Mother stated father yelled and behaved irrationally.

In a March 24, 2022 last minute information for the court, father provided DCFS with documents from the family law case, including a court order that Jason not be permanently removed from New York while the disposition of the case was pending and requiring mother to provide legal proof of paternity.

A May 11, 2022 last minute information for the court reflected father's expression of frustration that the foster mother was making it difficult for him to have his phone calls with Jason by not complying with the written schedule.

Father provided updated medical records, showing that he was being seen for sleep apnea and lumbar disc disorder. Father was on a low dose of Percocet for pain and had no side effects. Father also submitted a December 27, 2021 certificate for completion of parenting classes. A May 10, 2022 letter from father's case manager at his treatment program reported father was compliant with the program's rules, attending required sessions and submitting to random weekly drug tests. Father was re-assessing his past destructive behaviors and was focused on healthy goals to make positive changes. Father had tested negative for all mood altering substances within the past 90 days. Father's anticipated completion date for the program was June 2022.

DCFS recommended against placing Jason with father due to father's use of prescription medication and history of substance abuse. DCFS also expressed concern that parents had a history of domestic violence, which they had failed to address.

**Adjudication and disposition**

At the May 11, 2022 adjudication, the juvenile court informed the parties the New York court was declining jurisdiction. Father and mother appeared via Webex and were represented by counsel. Mother pled no contest. After hearing argument, the juvenile court sustained the amended petition.

Prior to the disposition hearing, DCFS provided a last minute information for the court indicating it was not recommending that Jason be released to the care of father. DCFS stated father "has a long-term substance abuse issue and prior treatment and services failed to ameliorate his substance abuse issues." DCFS noted that even while attending treatment, father continued to test positive for cocaine, opiates, and marijuana.

At the May 25, 2022 disposition hearing, the juvenile court heard testimony from mother, Isabella's father, and father. Mother reiterated her concerns about Jason being placed with father.

Father testified that he lived with Jason and mother for the first two and a half months after Jason was born. Mother was then hospitalized several times, and father had Jason during those periods. Father stated his visitation was monitored as ordered by a restraining order, and PGM and paternal grandfather monitored his visits. However, what was ordered for visitation was not always what was followed; it was dependent on what mother wanted, including father having the children overnight. Father stated he was able to have Jason in his home and was willing to have Isabella placed with him as well. Father did not want Jason placed with Ashley H. because Isabella had previously lived with her and was not treated well.

11

Father's counsel argued Jason and Isabella should be placed in father's care, or alternatively placement with father's brother should be ordered. Jason's counsel joined DCFS in asking that the child not be placed with either parent at that time.

The juvenile court declared Jason a dependent of the court, removing him from the custody of father based on father's substance abuse. He was also removed from mother's custody. Jason was ordered suitably placed. The court also ordered family reunification services and monitored visitation with Jason for father. Assessments of the homes of maternal aunt and paternal uncle and his wife were ordered. (Fns. omitted.)

The following section entitled "Progress reports" is taken from our previous nonpublished opinion in *In re Isabella M.* (Oct. 16, 2024, B330514).

**Progress reports**

At the August 24, 2022 progress hearing, mother submitted a letter from Fred Brown Recovery Services reflecting her admission into their outpatient drug and alcohol treatment program on July 22, 2022, and her consistent attendance in individual counseling and group sessions. She was receiving psychiatric care, was medication compliant, and she had a sponsor while working on a 12-step program. The children had been placed with [maternal great aunt] Lisa M. in Orange County.

By the November 21, 2022 section 366.21, subdivision (e) progress hearing, mother was compliant with the case plan. She was residing in Recovery Bridge Housing Sober Living Program and looking for permanent housing. She was on a waitlist at Miriam's House, which provided housing for one year to women

12

with children.  She was also on a waitlist for "Section 8" housing.  Mother had obtained a job and a car.  She was enrolled in mental health services at Behavioral Health Services.  Mother was visiting the children three times a week, and her visits had been liberalized to unmonitored.  Mother wanted to live with Lisa M. and the children if the children were returned to her.  Lisa M. said mother could live with her while she looked for her own residence.

On November 29, 2022, mother submitted a letter from Long Beach Rescue Mission saying mother had enrolled in their New Life Recovery Program on November 10, 2022.  DCFS expressed concern that mother "does not consistently manage mental health symptoms," which places the children in danger.  DCFS wanted mother to continue reunification services so she could show "consistency over time in her management of her mental health."  Because this was a new program, mother would need to show progress and consistency, because mother had started new programs before "and then left when she did not want to abide by the rules."

At the November 29, 2022 section 366.21, subdivision (e) hearing, the juvenile court found mother's progress to be partial and continued reunification services.  The court ordered mother to drug test every other week and permitted overnight visits with the children.

In the January 24, 2023 interim review report, DCFS reported mother was compliant with the case plan and was living at the Long Beach Rescue Mission.  She visited the children three times a week, with one overnight visit per week.  There was concern, however, that mother was minimizing her mental health issues.  Mother told the social worker she did not think she had

13

mental health problems and instead had made a poor decision to stay at the Venice encampment with the children. Mother's counselor at Long Beach Rescue Mission also expressed concern mother was minimizing her mental health and substance abuse needs.

**Last minute information for the court**

A January 24, 2023 last minute information for the court recommended Jason be placed with father in New York and family maintenance services be provided. The social worker assessed father's home, where he resided with PGM. Father expressed concern about the recurring nature of mother's mental health issues, recalling the children had been detained from her three times in New York. Mother had once gone out barefoot in the snow with Isabella dressed without proper clothes, talking about the FBI and CIA going "after her." Mother was hospitalized for a month after father called Mobile Mental Health. Father feared mother might abscond with the children again.

The social worker spoke with Mr. Hammond at Restorative Management where father completed his drug rehabilitation program. Father continued to attend groups and check in monthly, and was drug testing negative given his prescriptions for marijuana and Oxycodone. Father had support of the paternal grandparents, and Mr. Hammond had no concerns for Jason's safety in father's care. Also attached was a January 20, 2023 letter from father's individual therapist reflecting father's continued participation in therapy, indicating father was maintaining his focus on his children and was a "great father."

14

**Mother's section 388 petition**

Mother filed a section 388 petition on February 15, 2023, asking that Isabella be released to her and attaching numerous letters from her recent providers. Mother's address was listed as Miriam's House. Mother also filed a similar petition seeking to change the order removing Jason from her care.

On February 23, 2023, DCFS provided last minute information for the court including mother's statement she was not minimizing her mental health needs. Mother stated she never had any mental health concerns prior to dating father and believes her mental health symptoms were drug induced. Mother missed a child and family team meeting scheduled for February 9, 2023, because she required urgent medical care. She was also unable to be reached by the child guidance center intake coordinator, who had been trying to contact mother regarding enrollment papers.

On February 28, 2023, the juvenile court denied mother's section 388 petitions after a hearing, finding she was in partial compliance with her case plan, and it was not in the children's best interest to grant mother's petitions. The court ordered further liberalization of father's visits including unmonitored day visits when in California.

The following section, entitled "Status review report," is taken from our previous nonpublished opinion in *In re Isabella M., supra*, B330514.

**Status review report**

DCFS submitted a status review report for the May 30, 2023 section 366.21, subdivision (f) hearing. Mother had been residing at Lidia House, but left without informing DCFS. The social worker telephoned Lidia House to find out why mother left

15

and was informed mother had been asked to do a few things by the program that she did not do. Lidia House could not provide any further information without mother's consent. Maternal great aunt and uncle said mother was terminated from the program because they required mother to detox from Suboxone and mother had not completely done so.

Mother was residing at Miriam House, a residential program for women with mental illnesses and/or drug addiction. Mother enrolled in the program on February 24, 2023. However, on May 4, 2023, the program director informed DCFS mother had been terminated from the program for noncompliance. Mother left the house on May 3, 2023, at night and did not return. The director called mother on May 4, 2023, and mother said she got gas to go to the doctor. Mother had not responded to the social worker's requests for her current residence at the time of the preparation of the report.

On March 2, 2023, mother attended a dental appointment with Isabella and one of Isabella's caregivers to sign consent forms. Isabella needed anesthesia to complete the procedure. Prior to the procedure, when mother was alone with Isabella, mother gave Isabella a candy bar to eat so the procedure could not proceed. Mother refused to schedule another appointment and stated she would not sign consent forms until the children were in her car and she could drive them. On the way home from the dentist, Isabella informed maternal great aunt that mother had told her to say father uses drugs.

The caregiver also reported mother often canceled visits and the children were very dirty and hungry when they returned from seeing mother. They often ate only candy. Mother did not visit during the 10 days between when she left Lidia House and

went back to Miriam House.  When she visited at the caregivers' home, mother refused to help put Jason to bed.  During overnight visits, if Jason cried, mother would call the caregivers to come and get him.  Often she would end overnight visits early.

On March 21, 2023, when the caregivers came to pick up the children from their overnight visit with mother, they found Isabella alone in the lobby crying because she did not know where to find mother, who was outside in the rain with Jason, who was wearing only a diaper and a shirt.  The caregivers reported Jason did not sleep through the night after overnight visits with mother.  Isabella suggested it was probably because mother took Jason outside in the middle of the night to play, as mother told Isabella when Jason would not wake up in the mornings.

The social worker met with mother at Miriam House on March 13, 2023.  Mother said she stopped taking Suboxone.  She continued to attend 12-step meetings and see her psychiatrist and therapist.  Mother said she gave Isabella the candy bar because she did not want the dental procedure.

At the time of the writing of the status report, mother's whereabouts were unknown.  Mother left her housing program.  The caregivers reported mother had come to their home in the middle of the night asking for money and said she was contemplating driving to New York to check into a hospital.  By May 14, 2023, the maternal great aunt and uncle notified DCFS the children had to be relocated by June 1, 2023, due to mother's behavior.  The previous night, mother had come to their home with police, who said they found mother at a gas station, without a driver's license, and asked the maternal great aunt and uncle if they could move the car so it did not get towed.  Maternal great

uncle drove the car to a motel and then told mother, with the police present, not to sleep in the car in front of their home, as she had previously done. Mother accused maternal great uncle of sexually abusing his adult daughter, although the adult daughter denied any such behavior. Mother told police she wanted maternal great uncle arrested for threatening her. Mother said she was permitted to visit the children whenever she wished. Maternal great aunt and uncle told the social worker they loved the children, but mother's behavior threatened them, and they were considering a restraining order.

**Visits and recommendation**

DCFS reported father visited the children in California from April 19 to April 24, 2023. Father's visits with Jason were overnight and unmonitored. The caregivers reported the visits went well, and father took care of Jason during the visits while he was in Los Angeles. Jason was "extremely happy" to be with father, and father was very capable of taking care of the child. Father worked on the child's speech during visits. Father said he had been trying to regain custody of Jason for most of the child's life and wished to have Jason in his care.

Mother continued to have overnight visits with Jason while father was in Los Angeles.

Father had decreased his dosage of Oxycodone for back pain and continued to test negative for drugs.

DCFS recommended Jason be released to father with family maintenance services and for the children to have sibling visits in New York.

**Section 366.21, subdivision (f) reports and hearings**

Ashley H.'s New York home was approved, and DCFS sought court authorization to move Isabella there. Mother was

18

also considering moving to New York. DCFS recommended reunification services for mother be terminated.

On May 30, 2023, the juvenile court heard argument from counsel at the section 366.21, subdivision (f) hearing. Counsel for Isabella submitted on DCFS's recommendation that reunification services for mother be terminated. Mother objected. The court ordered Isabella transported to Ashley H.'s home in New York and returned mother's visits back to monitored, over mother's objection.

The court terminated Jason's suitable placement order and placed him in father's home with family maintenance services. The court ordered sibling visits at least twice a month. The court modified mother's visits to now be monitored over her counsel's objection.

At the continued hearing on June 29, 2023, DCFS reported that on June 4, 2023, Isabella was placed with Ashley H. in New York. Mother told the social worker she was hospitalized and considering moving to New York to be closer to Isabella and Jason.

**Section 364 report**

Jason had been released to father and PGM in New York. Jason was "happy, healthy, and adjusting well." Father was attentive and working on nurturing a secure attachment. Jason had been attending Head Start since September 2023, which helped Jason with separations and transitions and had linked the two to play therapy for Jason.

Mother moved to New York on June 14, 2023, to be near the children. She was living with MGM. Mother had enrolled at Action Toward Independence, an independent living program. She was also involved in mental health services at Mental Health

19

Association of America. Her visits with the children were monitored by her case manager.

Father continued at Restorative Management and drug-tested weekly with negative results. Father continued to see his individual therapist who commented father was "progressing well."

Sibling visits had been challenging due to Isabella's guardians.

Mother had weekly visits with Jason, monitored by her case manager or PGM, at neutral locations. MGM usually attended the visits as well. When mother sometimes failed to confirm visits in advance, those visits did not take place. Father said mother could call every day between 6:00 and 8:00 p.m. Mother called a few times a week and reported Jason sounded happy during the calls. Father reported mother sometimes called outside of the set hours, including once at 4:00 a.m.

PGM reported mother failed to adequately supervise Jason during visits, including on the monkey bars and the swing. For safety reasons MGM and PGM would have to intervene. Mother also refused to change the child's diaper during visits, even when prompted because it was full.

Father was concerned mother would try to leave the state with Jason again, and MGM would allow it. Father and PGM also worried about mother coaching Jason, as she had done with Isabella. Father wanted Jason to have a safe and stable home with him, but understood the child also needed to have relationships with mother and Isabella. Mother wanted Jason to reside with her.

Jason was too young to make a meaningful statement. He had a strong bond with father, who was providing him with a safe

and stable home. Father had been compliant with services and made an effort to ensure Jason had visits with mother and Isabella. Father had the support of the paternal family.

Jason enjoyed visits with mother, but mother lacked an understanding of safe supervision and refused to care for him in certain ways, such as changing his diaper. DCFS recommended Jason's relationship with mother be nurtured with support for safe supervision.

DCFS recommended termination of jurisdiction with a family law order granting father sole legal and physical custody of Jason and granting mother monitored visits.

**Section 364 hearing**

In advance of the hearing, mother's counsel submitted an exhibit list that included: a November 27, 2023 Mental Health Association letter confirming mother's enrollment in the program on July 20, 2023, and her compliance; September 29, 2023 drug test results; a September 27, 2023 letter from Access: Supports for Living reflecting mother was receiving therapeutic services and planning to seek psychiatric services; an August 22, 2023 letter from Fred Brown Recovery Services regarding mother's progress in their substance abuse program; an undated letter from Action Toward Independence Orange County Day Program reflecting mother completed her intake on June 22, 2023 and was eligible for services; a February 2, 2023 letter from Behavioral Health Services substance abuse program showing completion of their program; and a February 1, 2023 letter from Long Beach Rescue Mission acknowledging mother's participation in the program since November 20, 2022.

At the November 28, 2023 hearing, counsel for father asked the court to follow DCFS's recommendations; DCFS submitted on

21

father's arguments. Counsel for mother requested the court grant joint custody of the child and unmonitored, overnight visits for mother.

The court expressed its intent to follow DCFS's recommendation, stating "[t]he information in today's report regarding mother's recent visit is troubling. It doesn't allow room for liberalization at this time." The court further noted the parents "need to figure out [how] to co-parent protectively," including having contact with relatives that does not leave the child "with anxiety about having contact with either parent or relatives."

The court terminated jurisdiction and stayed the order pending receipt of a juvenile custody order granting father sole legal and physical custody of Jason with mother having monitored visits. The court included sibling visits, to take place twice a month.

On December 19, 2023, the custody order was received and the stay of the termination of jurisdiction order was lifted. Mother filed a notice of appeal the same day.

## DISCUSSION

### I. Applicable law and standard of review

When a child is under the jurisdiction of the juvenile court, all issues regarding his or her custody must be heard by the juvenile court. (§ 304.) "When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court." (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30.) When a juvenile court terminates its

22

jurisdiction over a dependent child, any exit orders regarding custody and visitation become part of the family court proceeding concerning the child and will remain in effect until terminated or modified by the family court. (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) "Although both the family court and the juvenile court focus on the best interests of the child, the juvenile court has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances." (*Roger S.*, at p. 31.)

We review the juvenile court's decision to terminate dependency jurisdiction and issue a custody order for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) We may not disturb the order unless the court "'"'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].'"'" (*Ibid.*)

## II. No abuse of discretion occurred

Mother argues the juvenile court's decision to grant father sole legal custody of Jason was arbitrary. Mother states the juvenile court's order effectively cut mother out of all important decisions in Jason's life, including medical and educational decisions. "An order granting a parent sole legal custody 'means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child.'" (*In re Marriage of Harris* (2004) 34 Cal.4th 210, 227.) Mother points to Family Code section 3020, subdivision (b), which provides that the public policy of this state is to "encourage parents to share the rights and responsibilities of child rearing . . . except when the contact would not be in the best interests of the child." Mother acknowledges this provision falls

23

short of mandating joint legal custody, but argues the juvenile court is required to have at least a reasonable basis to deny her legal custody over her objections.

The record reveals a reasonable basis for the juvenile court's decision. Mother's behavior throughout the proceedings has been erratic and unstable. She had a prior history with CPS in New York before coming to California and had received mental health diagnoses but was not compliant with medications. She left New York and brought the children to California without notifying father. After coming to California, she was confirmed to have enrolled in at least nine drug treatment programs, but completed none. Mother gave candy to Isabella before a dental appointment so that the dental procedure could not proceed. When mother's visits were liberalized to overnight, she returned the children dirty and hungry, called the maternal aunt to pick up the children early, and took Jason out to play in the middle of the night. Mother also had a history of leaving the children unsupervised. She minimized her mental health and substance abuse issues and made false allegations against the maternal relatives who were the children's caregivers, resulting in the children having to be relocated.

After mother returned to New York, she enrolled in another program, Action Toward Independence, as well as mental health services. Mother was permitted to call Jason each evening during a set period, but would sometimes fail to confirm visits and once called at 4:00 a.m. During the monitored visits, the grandmothers needed to intervene due to mother's lack of appropriate supervision of Jason and refusal to change his diaper. Father expressed concern mother might abscond with Jason a second time.

Mother's failure to appropriately address her mental health concerns, and her failure to adequately care for Jason, provide a reasonable basis for the juvenile court to grant father sole legal custody of the child.  In the future, mother may have a basis to seek relief or modification of the custody order in the superior court based on Jason's best interests.  (*In re Michelle M.* (1992) 8 Cal.App.4th 326, 328.)

## DISPOSITION

The order is affirmed.


CHAVEZ, J.

We concur:


ASHMANN-GERST, Acting P. J.


RICHARDSON, J.

25